**MULLIGAN v. EASTERN S. S. LINES, Inc.**

No. 23, Docket 21021.

United States Court of Appeals
Second Circuit.

Nov. 30, 1948.

See, also D.C., 6 F.R.D. 601.

George J. Engelman, of New York City, for plaintiff-appellee.

Tompkins, Boal & Tompkins, of New York City (Arthur M. Boal and Francis J. Fitzpatrick, both of New York City, of counsel), for defendant-appellant.

Before L. HAND, Chief Judge, and SWAN and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The appellant was the agent of the United States to manage and conduct, in accordance with the standard general agency agreement used during the late war by the War Shipping Administration, the business of the S.S. Francis Amasa Walker, a liberty vessel owned by the United States. The appellee's intestate was a boatswain on that vessel who received fatal injuries on February 1, 1945, while performing his duty in attempting to carry out an order to tighten a guywire, a part of the torpedo net defense equipment of the ship which had been installed by the United States Navy and was maintained by the Navy.

This equipment consisted of two heavy steel nets which were, when being used for protection from torpedoes, suspended over and along each side of the ship at a suitable distance and lowered into the water. The rigging by which they were thus moved and held in place included four booms, eight heavy steel guywires with turnbuckles and six stanchions. When the ship was loading or discharging cargo these nets with their rigging would have interfered with the work if kept in protective position. They had therefore been dismantled in port sufficiently to permit the vessel to load, and the decedent was fatally injured while at work preparing them to be put in protective position after the vessel was again at sea. The accident happened under the following circumstances.

The aft guywire on the aft boom on the port side of the ship needed tightening. It was attached through a turnbuckle which was about five feet long to an eye near the top of a steel stanchion installed on the center of the after deck of the ship. The stanchion stood up fourteen feet above the deck to which it was fastened at a point fourteen inches forward of the forward

end of the after deck house. Its top, which was eleven inches measured fore and aft and ten inches from port to starboard, was six feet and ten inches above the deck of the deck house. The end of the turnbuckle away from the top of the stanchion was attached by means of shackles to one end of the guywire, a heavy duty steel cable about an inch and one half in diameter which ran out to the outboard end of the aft boom of the torpedo net. That boom was about eighty-five feet long and was on a mast some fifty feet forward of the stanchion. In order to tighten the guywire the barrel of the turnbuckle had to be turned in the direction which would pull into it the threaded eyes at each end. The turnbuckle was of the closed barrel type with no opening to permit any view of the shafts of the eyebolts after they had entered it, but like all turnbuckles, whether they are open or closed, it had both left and right threading so that turning the barrel in one direction would take up on both eyebolts while turning in the opposite direction would loosen them. The only ways to determine accurately which direction of turn was needed to tighten the guywire were by looking to see whether the eyebolts were being drawn in by the rotation of the barrel or by judgment from the resistance to force applied to rotate it. The weight of the guywire and whatever strain there was on it would make the barrel turn more easily in the loosening direction and correspondingly harder in the tightening direction. The exposed threads on both eyebolts had recently been greased and that grease would have a tendency to pile up at the ends of the barrel during a tightening movement while the threads emerging on a loosening movement would lack this grease.

On the occasion of the accident the decedent climbed to the top of the stanchion and with one foot on a shackle of the starboard guywire attached to the same stanchion and the other on a shackle of the port guywire began to turn the barrel with a Stillson wrench. This kind of wrench has jaws which fasten firmly to the object on which they are set to bite and increase their pressure as the handle of the wrench is pulled in the direction of the bite; when the handle is moved in the opposite direction, however, the jaws are released at once and will slip back readily to take another bite when the handle is again moved as at first. Such a wrench may also be used to make a continuous turn and it was so used in this instance. The boatswain pushed the handle of the wrench down until a seaman standing on a railing on the deck of the deck house could reach it. The seaman then pulled it down and pushed it up until the boatswain could take hold of it to make his part of the turn. This continuous-turn manner of use was made possible by decedent's climbing up to stand on the assembly as he did instead of attempting to take part turns from the position in which the seaman stood. According to appellee's evidence, when about two and one half turns of the barrel had been made in a direction which from the decedent's position was clockwise and each eyebolt had thereby been moved about one half inch, one of these bolts left the barrel and the guywire fell. The decedent, thus losing his support in part, fell also and received the injuries which caused his death.

This suit was brought in the District Court for the Southern District of New York to recover damages in behalf of the widow and infant daughter of the decedent under the provisions of § 33 of the Jones Act, 41 Stat. 1007, 46 U.S.C.A. § 688. It was alleged that the appellant was negligent "in failing and neglecting to provide plaintiff's intestate with a safe place in which to work, in failing and neglecting to provide him with a seaworthy vessel, appurtenances and appliances, in failing and neglecting to provide him with safe and competent superiors, fellow servants and co-employees, in failing and neglecting to take the customary steps to protect his person and through the negligence and carelessness of the master, officers and crew of the S.S. Francis Amasa Walker." The suit was tried to a jury which returned a verdict for the plaintiff on which a final judgment was entered. This appeal is from that judgment.

Two issues are presented. The first is whether the court erred in failing to grant appellant's motion for a directed verdict based on the ground that the evidence was insufficient to show actionable negligence.

The second is whether the appellant may be sued at all in view of the provisions of the Clarification Act, 57 Stat. 45, 50 U.S.C. Appendix § 1291 et seq.

In a charge to which no exceptions were taken the trial judge left to the jury only the question of appellant's negligence confined to the condition and installation of the turnbuckle and the contributory negligence of the decedent in diminution of damages.

To show that the turnbuckle was improperly rigged so that a clockwise movement would loosen it instead of tightening it, there was undisputed evidence that whether a so-called clockwise movement has a tightening or loosening effect upon any turnbuckle depends entirely upon the relative position of the turnbuckle and the operator. If the latter faces one end of it a clockwise turn will move the barrel, relative to the screws in the direction opposite its movement on a clockwise turn from the other end. There was also evidence of a practice of placing turnbuckles so that a tightening effect will be produced by a movement in a clockwise direction by one in the position from which they are most likely to be used.

As one end of this turnbuckle, which was about five feet long, was close to the top of the stanchion while the other extended out over the deck the length of the turnbuckle and each were about fourteen feet above it, the jury had evidence of conditions which would enable it to find that one who undertook to turn the shaft would be expected to do it while facing the end nearest the stanchion. That was where the most support for the operator could be had. That being so, the evidence enabled the jury to find also that the turnbuckle should have been installed so that a tightening movement of the barrel would be clockwise for an operator from the end near the stanchion. There was also contradicted evidence from which, if believed, the jury could have found that this turnbuckle was negligently installed so that a clockwise movement of the barrel from the end near the stanchion would loosen it.

Moreover, there was some evidence that the turnbuckle was defective because the threads of one of the eyebolts were worn, the seaman who was helping the decedent and who saw these threads after the accident having testified that about two inches from the end "the threads weren't sharp at all. They were rounded a little bit like. Well, you could see they were worn down already." He also testified that about three inches of the threads were ungreased while the threads which had been outside the barrel were greased.

Though this evidence of visibly worn screw threads was flatly contradicted, the testimony of one who saw them could have been believed by the jury. So could the evidence which showed that the movement had been about two and one half turns, or one half inch, on each eyebolt. Taken together this evidence showed that the eyebolt which came out of the barrel had been inserted at least to the extent it was ungreased, i. e., about three inches. Consequently the jury could have found that when the decedent began to turn the barrel about three inches of threading was inside it; that after a movement of about one half an inch the eyebolt pulled out when at least two inches and one half of the threading should have been holding in the barrel. A finding that the turnbuckle was so worn that it was defective would follow as an inevitable conclusion.

We think there was enough evidence to take this issue to the jury. To be sure it was shown unqualifiedly that the United States Navy installed the torpedo net defense equipment on the vessel and that the Navy undertook to keep it inspected and in repair. We will take it for granted that the appellant was bound to accept and use this equipment as installed and as the Navy directed. But the gear had been on the ship for at least one previous voyage across the Atlantic and back and it had been inspected by a mate who then knew, or should have known, that the turnbuckle was defective in the respects here shown and whose knowledge is attributable as a matter of law to the appellant. The latter is thus chargeable with knowledge that the ship's gear was defective. It was then in a situation analogous to that of one whose ship has become unseaworthy on a voyage and must be operated in that condition while at sea. Such operation requires care

which is reasonable in the circumstances and the failure to exercise it is negligence. Here the appellant, so the jury could have found, ordered the decedent to tighten the turnbuckle without giving him any warning of its defective condition and without providing any means for him to perform the work without climbing to a position which, hazardous at best, made his safety unnecessarily and carelessly dependent upon what would happen when he manipulated worn and improperly installed gear. Upon such evidence the negligence of the appellant was clearly a question for the jury.

On the second issue we hold that the appellant, as the operating agent of the vessel, is not immune from suit because of the provisions of the Clarification Act, supra, and do so for the reasons stated in our recent decision in McAllister v. Cosmopolitan Shipping Co., 2 Cir., 169 F.2d 4.

Judgment affirmed.