## LE BARON v. LOS ANGELES BUILDING & CONSTRUCTION TRADES COUNCIL et al.

### No. 9629.

United States District Court
S. D. California, Central Division.
May 26, 1949.

Robert N. Denham, General Counsel, David P. Findling, Associate General Counsel, Winthrop A. Johns, Assistant General Counsel, Washington, D. C., Charles K. Hackler, Chief Law Officer, Jerome Smith, Los Angeles, California, for petitioner.

Arthur Garrett, Los Angeles, California, for respondents.

YANKWICH, District Judge.

### I. The Facts in the Case.

On May 3, 1949, Howard F. Le Baron, Regional Director of the Twenty-First Region of the National Labor Relations Board, filed a petition for injunction under Section 10(l) of the National Labor Relations Act, as amended,[1] seeking relief pending the final adjudication by the Board of a matter then pending before them on charges alleging that the respondents are engaged in violations of Section 8(b), Subdivision (4) (D) of the Act.[2]

The Respondents are the Los Angeles Building and Construction Trades Council, —to be referred to as Council,—a labor association consisting of eighteen labor organizations engaged in the building trades industry in the Los Angeles area, Lloyd A. Mashburn, its agent, Millwright and Machinery Erectors Local 1607 of the United Brotherhood of Carpenters and Joiners of America, American Federation of Labor, —to to be called Millwrights,—and Herman R. Barbaglia, its agent.

On April 15, 1949, Local Lodge 1235 of the International Association of Machinists,—to be called Machinists,—filed charges with the Board alleging that the Respondents have engaged in, and are engaging in unfair practices in violation of the Act, which have been referred to the petitioner as Regional Director for investigation.

The facts back of the charge are: Southern California Edison Company,— to be designated as Edison,—a California corporation, is a public utility engaged in furnishing electrical energy and service to the Los Angeles and Southern California area. Thirty-nine percent of its output of electrical energy goes to instrumentalities of interstate commerce and concerns engaged in interstate commerce, such as oil refineries, rubber companies, steel plants and aircraft machines. In the operation of its business, Edison, during the past year, purchased raw materials of a value in excess of three million dollars, of which approximately 66-⅔ per cent originated outside the State of California. Approximately 25½ percent of the total power utilized by it during the past year came from outside the state. Edison is now engaged in

[1] 29 U.S.C.A. §§ 141 et seq., 151 et seq.

[2] 29 U.S.C.A. § 158(b) (4) (D).

the construction and equipment of a new steam turbine electric power generation station at Redondo Beach, California, which was begun in July, 1946. The estimated completed cost of it is in excess of $38,000,000.00, of which $18,500,000.00 is the purchase value of equipment, $12,700,-000.00 in value of which has been, or will be transported from outside the State of California directly to the job site. The construction is 75 percent completed and the units now in operation at the station furnish approximately 15 percent of Edison's total output of electrical energy.

Stone and Webster, a construction corporation, has the general contract for construction of the station. For the past several months, it has had approximately 550 of its own employees working on the project. There are other sub-contractors, whose employees have been engaged on the project, and who are members of all the trade unions affiliated with the Council.

Some time prior to December, 1948, Edison contracted with Westinghouse for the furnishing and installation of several steam turbine generators at the Redondo Beach plant. These generators, of the total value of approximately $4,800,000.00, were manufactured by Westinghouse in Lester and East Pittsburgh, Pennsylvania, whence they were shipped to California for installation.

On January 31, 1949, Westinghouse began the installation of one of the turbine generators, a 60,000 kilowatt unit, pursuant to its contract with Edison. In the installation, it used employees who were members of Machinists. On February 2, 1949, the Respondents, as the Complaint alleges, engaged in and by "orders, directions and instructions induced and encouraged" the employees of Stone & Webster, Westinghouse and others on the Redondo Beach station project to "engage in a strike or concerted refusal in the course of their employment to transport or, otherwise, handle or work" on Westinghouse products or to perform services for their employers in connection with the project.

Westinghouse Electric Corporation, on March 29, 1949, began the unloading of a turbine generator of 60,000 kilowatt units, shipped from its plant at Lester, Pennsylvania to California for installation by its employees, who are members of Machinists, at the Redondo Beach station, using in the unloading operation riggers who are members of International Association of Bridge Structural and Ornamental Iron Workers Local No. 433, a constituent union of the Council.

On April 11, 1949, the Respondents engaged in and "by orders, directions, instructions induced and encouraged" the riggers employed by Westinghouse to engage in a strike or concerted refusal "in the course of their employment, to transport, or otherwise handle or work on the Westinghouse products" in connection with the Redondo Beach installation.

The object of the acts of the respondents was,—in the language of the Complaint,—to require Westinghouse and Stone and Webster to "assign the work of installing the steam turbine generators at the Redondo Beach station to members of Millwrights, rather than to the employees of Westinghouse, who now are members of Machinists."

The petition also averred the existence of a critical power shortage in Southern California, resulting from an inadequate supply of water for the generation of power and increased demand for electrical power,—a shortage which the Redondo Beach station was planned to alleviate by generating electrical energy by steam and increasing Edison's production capacity by 30 percent.

In the main, these facts are not disputed, either by the Return to the Order to Show Cause, or the affidavits filed in conjunction with the hearing on the Order. It appeared at the hearing that only two members of Machinists were involved, who had been withdrawn from their job in order to secure the return to work of the member unions of the Council. Before the hearing of the Order to Show Cause, on May 11, 1949, the Board rendered its decision under Section 10(k) of the Act.[3]

In substance, it found that the Respondents "are not and have not been, lawfully

[3] 29 U.S.C.A. § 160(k).

entitled to force or require Westinghouse Electric Corporation to assign work on the installation of steam turbine generators at Southern California Edison Company's plant at Redondo Beach, California, to members of Millwright and Machinery Erectors Local 1607, of the United Brotherhood of Carpenters and Joiners of America, A.F.L., rather than to employees of Westinghouse Electric Corporation who are members of International Association of Machinists, Local Lodge 1235."

Other facts will be referred to further on in the opinion.

Before me is an application for a temporary injunction.

## II. The Legal Questions Involved

### (A) The Aim of the Taft-Hartley Act.

The determination of the problem involved here calls for the interpretation of certain provisions of the Labor Management Relations Act of 1947, popularly known as the Taft-Hartley Act.[4] That, in turn, requires a consideration of the legislative object sought to be attained.[5] One of the objects of the National Labor Relations Act [6], which this Act purported to amend and supplement, was to encourage "the practice and procedure of collective bargaining" and to protect "the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."[7]

The jurisprudence of the Act, declared both by the Board and the Courts, reflected these twin aims of the Act.— the encouragement of unionization and of

collective bargaining through it. For this purpose, the Act conferred certain rights on the workers as groups, and prohibited certain acts of the employers inconsistent with these aims, which were declared to be unfair practices on the part of the employers.[8] This it did through the use of plenary powers of the Congress to regulate interstate commerce.[9] The Taft-Hartley Act did not aim to confer any additional organizational rights. To the contrary, it aimed to take away certain rights, which, either by the language of the Act, or through administrative and judicial interpretation, had been held to flow from its enactment. As one writer has put it:

"The Taft-Hartley amendments represent an abandonment of the policy of affirmatively encouraging the spread of union organization and collective bargaining." [10]

This aim must be kept in mind in resolving the limited issue which the present proceeding presents.

### (B) The Validity of the Prohibition Against Forced Work Assignment.

At the outset, we are met with the challenge that Section 8(b) (4) (D) of the Act [11], which declares it to be an unfair practice on the part of a labor organization or its agent to force or require an employer to assign particular work to employees in a particular organization or group, rather than another, is unconstitutional.

As a matter of judicial policy, the constitutionality of a statute should not be determined upon a motion of this character, but rather upon a full hearing on the matters. For the factual situation may affect the constitutional aspects of a stat-

4 29 U.S.C.A. § 141 et seq.

5 United States v. American Trucking Ass'ns, 1940, 310 U.S. 534, 543-544, 60 S.Ct. 1059, 84 L.Ed. 1345; Chatwin v. United States, 1946, 326 U.S. 455, 463-464, 66 S.Ct. 233, 90 L.Ed. 198; United States v. Carbone, 1946, 327 U.S. 633, 637-639, 66 S.Ct. 734, 90 L.Ed. 904.

6 29 U.S.C.A. § 151 et seq.

7 29 U.S.C.A. § 151.

8 29 U.S.C.A. § 160.

9 National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108

A.L.R. 1352. When exercising this power, the Congress has the unlimited choice of means "considered necessary for bringing about the desired conditions in the channels of interstate commerce." American Power & Light Co. v. Securities & Exchange Commission, 1946, 329 U.S. 90, 100, 67 S.Ct. 133, 140, 91 L.Ed. 103.

10 Archibald Cox, Some Aspects of the Labor Management Relations Act, 1947, 61 Harvard Law Review, p. 1 et seq.; p. 274 et seq., at p. 44.

11 29 U.S.C.A. § 158(b) (4) (D).

ute. Such an attitude is enjoined upon us by the principle which commands us to place upon any statutory enactment an interpretation consistent with constitutionality.[12] The broad implications of the earlier labor cases [13], which equated certain union practices with the guaranty of free speech of the First Amendment, have been brushed aside by the later decisions of the Supreme Court.[14] The gloss of the late cases is that both the state legislatures and the Congress may prohibit union practices which they deem socially harmful. Very recently, the Supreme Court stated that neither the First nor the Thirteenth Amendment stands in the way of outlawing certain acts by unions or their agents.[15] The statute under consideration permitted a State Board to forbid intermittent and unannounced work stoppages. A state statute prohibiting peaceful picketing was sustained [16] against the attack that it interfered with the dissemination of truthful information about a labor dispute under the doctrine of Thornhill v. Alabama.[17] So-called "right-to-work" statutes, which forbid denial of employment because of non-membership in labor organizations have been given judicial sanction in almost unanimous decisions.[18] These state enactments preceded the Taft-Hartley Act. In fact, they represent local movements to limit the organizational rights of labor which the Taft-Hartley Act, later, sought to, and did, adopt as national policy. Whether it is socially wise to determine by legislation policies which heretofore had been left to the "collective bargaining and the play of economic forces" [19], is beyond the scope of this inquiry. Our reference to it is merely to point to the touchstone by which the Act must be assayed. And the conclusion is inescapable that, in dealing with the almost limitless power to regulate commerce, the Congress cannot be said to have exceeded its constitutional bounds when it declared coercion in the assignment of work (and "requiring", by use of economic power, is as coercive as "forcing") to one rather than another individual or group to be an unfair labor practice, when the states can, by legislation, prohibit group practices by unions which deny employment to outsiders, interfere with production unnecessarily or result in secondary boycotts or in picketing of the most peaceful manner.

Apposite on the subject are the words of Judge Bratton:

"The constitutional right of free speech and free press postulates the authority of Congress to enact legislation reasonably adapted to the protection of interstate commerce against harmful encroachments arising out of secondary boycotts. The promulgation and circulation of a blacklist and the picketing of premises as the means of waging a secondary boycott which has the effect of substantially burdening or obstructing interstate commerce is not protected by the First Amendment or section 8(c) of the act. Concretely, neither the constitutional nor statutory provision protected appellants in their blacklisting of Klassen and their picketing of its premises as a means of waging a secondary boycott against that company, with substantially harmful effect upon interstate commerce." [20]

We conclude that the section under discussion presents no constitutional infirmity.

[12] Anniston Mfg. Co. v. Davis, 1937, 301 U.S. 337, 351–353, 57 S.Ct. 816, 81 L.Ed. 1143; Ex parte Mitsuye Endo, 1944, 323 U.S. 283, 299–300, 65 S.Ct. 208, 89 L.Ed. 243.

[13] Cf. Thornhill v. Alabama, 1940, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093.

[14] Barbara Nachtrieb Armstrong, Where are We Going with Picketing?, 1948, 36 Calif. Law Rev., p. 1.

[15] International Union, U. A. W. v. Wisconsin Employment Relations Board, 1948, 336 U.S. 245, 251, 69 S.Ct. 516.

[16] Gigoney v. Empire Storage & Ice Co., 1947, 336 U.S. 490, 69 S.Ct. 684.

[17] Thornhill v. Alabama, 1940, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093.

[18] Lincoln Federal Labor Union v. Northwestern Iron & Metal Co., 1949, 335 U.S. 525, 69 S.Ct. 251, and see; Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, 1949, 336 U.S. 301, 69 S.Ct. 584.

[19] Archibald Cox, op. cit., p. 315; and see, Thomas R. Mulroy, The Taft-Hartley Act in Action, 1948, 15 University of Chicago Law Review, p. 595, et seq.

[20] United Brotherhood of Carpenters v. Sperry, 10 Cir., 1948, 170 F.2d 863, 869; and see, Painting Specialties and

III. The Adequacy of the Showing in the Case

(A) Discretion in Granting Temporary Injunctions.

We come now to the showing made in the case, which the Respondents claim to be inadequate. Before considering the matter, we advert to the principle that the granting or denying of a temporary injunction is "primarily a matter of discretion for the trial judge".[21] That this general principle has found application in cases arising under this very Act is evidenced by the following language of the Court of Appeals for the Tenth Circuit:

"It is not the inflexible duty of the court in every case of this kind to grant a temporary injunction to remain in force and effect until the Board makes its final adjudication of the charge of unfair labor practice. The court has a reasonable permissive range for the exercise of its discretion in the granting of injunctive relief appropriate to the particular circumstances presented, or in withholding its writ."[22]

The steps required for invoking the jurisdiction of this court are described in Section (10) (*l*) of the Act, which reads, in part:

"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4), (A), (B), or (C) of section 158(b) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any district court of the United States (including the District Court of the United States for the District of Columbia) within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law:"[23]

The final clause of the Act reads:

"In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 158 (f) (4) (D) of this title."[24]

The Respondents seem to think that the clause last cited is meaningless. They call it "an afterthought". We see no reason for so labelling it. It follows the pattern adopted in legislation where, after describing, in detail, a procedure to apply under certain conditions, an omnibus clause is added declaring that the same procedure shall obtain under other provisions of the Act. So here, it is first recited that before an application is made to the court, there must be (1) a charge of unfair labor practices, (2) a preliminary inveistgation, (3) reasonable belief induced by the investigation that the charge is true and that a Complaint should issue. It is then specifically provided that this procedure shall not only apply to violations of unfair labor practices under Section 8(b) (4) (A, B, and C) but also to 8(b) (4) (D). Time does not permit an investigation to determine the origin of the last clause or the reason why it was not included in the general language of the subdivision. It may be surmised that it originated some time during the legislative transformation which the Act underwent before the two Houses or in conference and that, rather than rewrite the entire section to include Clause (D), the specific provision was added. Be that as it may, it is quite apparent

Paper etc. v. Le Baron, 9 Cir., 1949, 171 F.2d 331.

[21] Lane Bryant, Inc., v. Maternity Lane, 9 Cir., 1949, 173 F.2d 559, 564, 565; and see, Virginia Ry. Co. v. System Federation, etc., 1937, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789; Hecht Co. v. Bowles, 1944, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754.

[22] United Brotherhood of Carpenters v. Sperry, 10 Cir., 1948, 170 F.2d 863, 868, 869.

[23] 29 U.S.C.A. § 160(*l*).

[24] 29 U.S.C.A. § 160(*l*).

that it is just as effective to make the procedure applicable to violations under Clause (D) as to the others. In conformity with the requirements of the Statute, as already appears, the Complaint alleges the making of a charge, which is attached to the petition as an exhibit. Examination shows that the charge is contained in more or less formal documents on printed blanks supplied, evidently, by the Board and signed by a representative of the Machinists. The specific acts complained of are set out in the petition and the affidavits which accompanied it. An extensive hearing was had, after notice, and testimony was taken on behalf of the complainants and respondents. It has been stated that the transcript covers over 1000 pages. Portions of it contained in affidavits filed in conjunction with this hearing exceed 150 pages.

On May 11, 1949, the Board rendered its decision, the terms of which are adverted to in the statement of facts. The petition states that the Regional Director, to whom was delegated the duty to make the investigation, and after such investigation "has reasonable cause to believe that the said second amended charge is true and that a complaint of the Board based thereon should issue against the respondents pursuant to Section 10(b) of the Act. More particularly, and upon the basis of such investigation and of the evidence disclosed as a result thereof, petitioner has reasonable cause to believe and believes that respondents have engaged in conduct in violation of Section 8(b), subsection (4) (D) of the Act, and affecting commerce within the meaning of Section 2, subsection (6) and (7) of the Act."

The action of the Board, in making a determination under the provision of Section 10(k) of the Act,[25] is a confirmation of the existence of reasonable cause to believe that the charge is true. It is true that no coercive action has yet been taken by the Board. For, under the provisions of the Act, the Respondents have the alternative of either complying with the decision or of voluntarily adjusting the dispute with the employers. Either of these acts, if it occurs, will be followed by a mandatory dismissal. At the time of the hearing, there was no indication of the action to be taken by the Respondents. The order could not, as is claimed, make the question before the Court moot, unless there is compliance or adjustment before action is taken on the matter pending before the Court. The time for such action has long passed, and, when this is written, there has been neither compliance nor adjustment. The Respondents would have us review the facts and determine either that the determination by the Board was wrong or that the facts were such that they do not show reasonable ground for believing that a violation of law had occurred.

(B) Reasonable Grounds.

Even if we were sitting as a court of appeal, with power to review the sufficiency of the findings of the Board, we would be bound to follow them, if based upon conflicting testimony or upon divergent inferences which could be drawn from even admitted facts.[26] As it is, the invocation of the power of this court is not conditioned upon such finding. All that the petitioner has to show is that he has reasonable cause to believe that the charge is true and that a complaint should issue. The phrases "reasonable cause" or "reasonable ground" are standard in law. Their meaning, when made a condition for action, has long been established. The test by which compliance is determined is whether the facts are such that a reasonable person could be led to believe that they constitute a violation of law. They need not be sufficient to actually prove such violation. As said by the Court of Appeals for the Eighth Circuit, in interpreting a similar requirement under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq.:

"For investigatory purposes under the Act, it would amount simply to a justifiable basis for believing that a certain state of facts probably exists, derived from reasonable inquiry or other credible information. As applied to the immediate situation, it would be such facts or information as rea-

---

25 29 U.S.C.A. § 160(k).

26 Grace Bros. v. Commissioner, 9 Cir., 1949, 173 F.2d 170; Yankwich, Findings Under the Federal Rules of Civil Procedure, 1948, 8 F.R.D., 271, 288.

sonably would lead the Administrator to believe that appellees' business, in some phase, was apparently and probably subject to the Act." [27]

It is undisputed that the controversy here relates to the right of Machinists to have the work assigned to them rather than have it assigned to some of the members of the unions in the respondent group. Whether we call this a "jurisdictional" dispute or not is immaterial. The lengthy hearing, the fact that the Respondents did call, and are threatening to call again, a strike involving over 500 persons, in order to enforce the demand that two machinists be not given particular work, indicates the seriousness of the situation. And the insistence of Machinists, whether they constitute a bona fide labor organization, or we apply to them the term, so opprobrious in labor circles, of "company union", on the right of the two men to this work, is definite proof that a situation has arisen where the Regional Director can reasonably reach the conclusion that the problem involved is an attempt on the part of the respondents to "force" or "require" their employers to assign the work to a particular labor organization, group or class. The Act does not exclude company unions from the designation of "labor organizations." The term is defined in this manner:

"The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." [28]

This definition is broad enough to cover, as its language specifically states, any organization of any kind, or any agency or representation committee of workers. The fact alluded to at the argument that this particular group may have been organized at the instigation of the employer is of little significance. For, as already stated, it is not the object of the statute to further "regular" labor organizations. Indeed, it seeks to curtail their authority and to set up against them the rights of others, whether organized or not. A writer, who is in sympathy with the policy of the Act, sets forth as one of the changes in the philosophy of labor-management relations, introduced by the Act, the fact that

"The Act confers for the first time upon employees the right to 'refrain' from exercising the right to join a union, except in the case of a union shop." [29]

So the problem must be solved with this aim of the Act in view. To say that, in the light of the facts which are before the Court, the Regional Director has not shown reasonable ground for his belief that a violation has occurred, is to totally disregard the realities which the record in this proceeding presents.

 Grant that, notwithstanding the Director's conclusion, the granting of a temporary injunction still remains discretionary, what has just been said shows conclusively that it should issue. The aim of all legislation and of government, for that matter, is to achieve social peace. The aim of labor legislation is to achieve peace in labor relations. The means of achieve-

---

[27] Walling v. Benson, 8 Cir., 1943, 137 F.2d 501, 506, 149 A.L.R. 186, and see, Grant v. National Bank, 1878, 97 U.S. 80, 24 L.Ed. 971; McDougal v. Central Union Conference Ass'n, 10 Cir., 1940, 110 F.2d 939; Canright v. General Finance Corp., 7 Cir., 1941, 123 F.2d 98, 99; Cusick v. Second National Bank, 1940, 73 App.D.C. 16, 115 F.2d 150, 153–155; Bowles v. Montgomery Ward & Co., 7 Cir., 1944, 143 F.2d 38, 42; Van Sant v. American Exp. Co., 3 Cir., 1947, 158 F.2d 924, 930. Even in criminal law, when a showing of "reasonable" or "probable" cause or ground is required,—such as, for instance, before holding a defendant to answer after preliminary examination,—under Rule 5(c) of the Federal Rules of Criminal Procedure, 18 U.S.C.A.,—only a prima facie showing need be made. And, the evidence need not be of a character which would convict. See, McNamara v. Henkel, 1913, 226 U.S. 520, 33 S.Ct. 146, 57 L.Ed. 330; Collins v. Loisel, 1922, 259 U.S. 309, 42 S.Ct. 469, 66 L.Ed. 956; Burton v. Smithers, 4 Cir., 1929, 31 F.2d 966; Curreri v. Vice, 9 Cir., 1935, 77 F.2d 130. Yankwich, Commentary on Criminal Rules, 1946, p. 149.

[28] 29 U.S.C.A. § 152(5).

[29] Mulroy, op. cit., loc. cit., at 596.

ment are under the sole control of legislators. Here the legislative body has laid down a complete scheme which must be followed both in the realms of administration and judicature. In matters as to which discretion is rested in the court, the inquiry in a particular case should be whether the public good will be served by using its coercive powers. That calls for a balancing of interests, in the light of the social aims to be attained. Courts should, and do, hesitate to issue temporary injunctions pending the final determination of a lawsuit, when such action would, in effect, settle the controversy. Here, the issuance of the injunction would not mean such determination. It would merely mean that two men would be permitted to do certain work until the Board determines,—assuming that there is no compliance or adjustment of the proceeding pending before it, —whether other action shall be taken under the Act. The presence of two men on a project requiring the services of hundreds would not result in any damage to the respondent organizations or any loss of prestige or "face" to them or their members. If the ultimate action favor Machinists, it would merely mean that on the particular job,—which may be completed by the time the Board has made a final order,—two outsiders,—let us call them "interlopers"—have done part of the work. Well, the Taft-Hartley Act postulates the possibility that situations may arise where persons not connected with regular or orthodox labor organizations might work alongside the members of such organizations. If the ruling be in favor of the Respondents, then the loss is not greater than that two persons have drawn employment from a source which, by right, belongs to the Respondents.

As against this, we have the threat of a strike by hundreds of persons on a construction and installation which undeniably has the character of interstate commerce,[30] from which great harm can flow, not only to the employers, but to the community

which the Edison Company serves. This, because of the consequential delay in the construction of a plant, the aim of which is to increase the availability of electrical power for transmission and distribution in interstate commerce, at a time when there is a diminution of the water supply due to the scanty rain-fall in this region in the last four or five years.

So a temporary injunction until the Board determines the controversy by a final order will serve the public good.

The motion for temporary injunction is granted, in terms contained in separate order filed herewith.

---

[30] Wickard v. Filburn, 1942, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122; National Labor Relations Board v. Fainblatt, 1939, 306 U.S. 601, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014; Mabee v. White Plains Pub. Co., 1946, 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607; Mandeville Island Farms v. American Crystal Sugar Co., 1948, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328.