UNITED STATES *v.* CARBONE ET AL.

No. 474.   Argued February 26, 27, 1946.—Decided March 25, 1946.

*Frederick Bernays Wiener* argued the cause for the United States. With him on the brief were *Solicitor General McGrath, Robert S. Erdahl* and *Irving S. Shapiro.*

*Hammond E. Chaffetz* argued the cause for Carbone et al., appellees, and *Michael Carchia* argued the cause for DiNunno, appellee. With them on the brief was *Walter F. Levis.*

Mr. Justice Murphy delivered the opinion of the Court.

This case comes to us under the Criminal Appeals Act [1] directly from the United States District Court for the District of Massachusetts. It raises an important question as to the meaning and scope of § 1 of the Act of June 13, 1934,[2] commonly known as the Kickback Act, making it unlawful to prevent anyone employed in construction or repair work of a public nature or financed in whole or in part by the United States from receiving the full compensation to which he is entitled.

Three of the appellees are officers of Local 39 of the International Hod Carriers' Building and Common Laborers' Union of America; the fourth appellee is president of the Eastern Massachusetts Laborers District Council and is also employed by Local 39. They were indicted for conspiring to violate § 1 of the Kickback Act. It was charged

---

[1] Act of March 2, 1907, 34 Stat. 1246, as amended by the Act of May 9, 1942, 56 Stat. 271; 18 U. S. C. § 682.

[2] Section 1 of the Act provides: "Whoever shall induce any person employed in the construction, prosecution, or completion of any public building, public work, or building or work financed in whole or in part by loans or grants from the United States, or in the repair thereof to give up any part of the compensation to which he is entitled under his contract of employment, by force, intimidation, threat of procuring dismissal from such employment, or by any other manner whatsoever, shall be fined not more than $5,000, or imprisoned not more than five years, or both." 48 Stat. 948; 40 U. S. C. § 276b.

that during the period of the alleged conspiracy, October 1, 1940, to March 30, 1941, two contractors were engaged in the construction of various public buildings for the United States at Fort Devens, Massachusetts. The appellees, by virtue of their positions with Local 39, made an agreement with the contractors whereby the latter undertook to employ as laborers only such persons as were approved by appellees and to discharge any such employees at appellees' request. The contractors also agreed to employ forty persons named by the appellees, known as stewards, to perform such duties as the appellees might direct, and to provide an office for the appellees on the site of the construction. About 7,500 laborers were employed during the course of the construction.

Pursuant to this agreement, the appellees approved to the contractors for employment as laborers members of Local 39 or of other locals of the International Union and only such other persons as paid the appellees the sum of $5.00. The appellees represented to the latter persons that this payment would be regarded as an installment upon the initiation fee of Local 39 and the International Union and that each such employee would be required to pay the appellees $5.00 per week until the total initiation fee was paid "or the person would not be permitted to continue work upon the said construction." Receipts were given for each weekly payment. The initiation fee was originally $50.00, but it was later reduced to $40.00 and then to $20.00.

It was further charged that the appellees directed the stewards each week to go among the laborers and demand of each nonmember of the union either that he display a receipt showing that he had paid the $5.00 for the current week or that he immediately pay that sum to the stewards or to the appellees "under threat of procuring his dismissal from his employment" if he did not do so. The appellees allegedly were able to carry out this threat by reason of

their agreement with the contractors, the appellees "well knowing, and intending, that the laborers would pay the said five dollars out of the compensation to which they were entitled under their contracts of employment with the said contractors."

The indictment also stated that the appellees kept no records of those who made payments to them. But if a laborer should present receipts showing payment of the initiation fee in full, his name was recorded and sent to the headquarters of the International Union with the sum of $5.35, representing the share of the fee to which the International was entitled under its rules. And the appellees "made no report to the Local 39, or to anyone, of the amount they had received from laborers paying less than the full initiation fee as aforesaid, or the total sums they had collected in this way, nor did they cause any of the sums collected in this way and received by them to be recorded in the Financial Secretary's book as the rules of the said International Union require: The defendants [appellees] well knowing that the majority of those who paid the initial five dollars would not and did not complete payment of the full initiation fee."

The indictment concluded by charging that the appellees acted in concert in these matters, that they induced the laborers to give up part of the compensation to which they were entitled under their contracts, that they represented that they were acting for Local 39 and the International, and that they concealed from these organizations the sums they thus collected from laborers who did not pay the initiation fee in full.

The appellees moved to dismiss the indictment, alleging as one ground that it did not state an offense cognizable in law. Relying upon this Court's decision in *United States* v. *Laudani,* 320 U. S. 543, the District Court granted the motions. 61 F. Supp. 882. It plainly was of the view that the facts as alleged in the indictment fell

outside the scope of the Kickback Act. It stated that it did not believe that "either the history or the purpose of the Kickback legislation warrants an extension of its scope to include these defendants. . . . The closed shop is within the legitimate objectives of trade unionism. Implementation of this objective by the means used by these defendants should not expose them to the risk of criminal prosecution." From this judgment the United States appeals.

We agree with the District Court. Section 1 of the Kickback Act punishes "whoever" induces another person employed on a federally financed project "to give up any part of the compensation to which he is entitled under his contract of employment, by force, intimidation, threat of procuring dismissal from such employment, or by any other manner whatsoever . . ." The United States contends that this provision applies to the instant situation inasmuch as the appellees induced certain workers on a federal project to give up part of the compensation to which they were entitled by threatening to procure dismissal from their employment. Emphasis is placed upon the allegation in the indictment that the appellees had power to enforce this threat by reason of the closed-shop agreement with the contractors and upon the further allegation that the appellees neglected to report or to turn over to Local 39 of the International Union all of the money collected, as required by the rules of those organizations.

But as is apparent from our discussion in the *Laudani* case, not every person or act falling within the literal sweep of the language of the Kickback Act necessarily comes within its intent and purpose. That language must be read and applied in light of the evils which gave rise to the statute and the aims which the proponents sought to achieve. When that is done the inapplicability of the Act to the facts set forth in the indictment becomes clear.

The statute grew out of an investigation of so-called rackets by a subcommittee of the Senate Committee on Commerce pursuant to S. Res. 74, 73d Cong., 2d Sess. This investigation "revealed that large sums of money have been extracted from the pockets of American labor, to enrich contractors, subcontractors, and their officials." S. Rep. No. 803, 73d Cong., 2d Sess. It was found that laborers, especially those pursuing the building trades, often were paid the prevailing rate of wages but were compelled by their employers to give back or kick back a percentage of the pay which they had lawfully earned and received. Discharge was threatened unless they complied with the demands for kickbacks. The employers were thereby enabled to evade the scale of wages imposed by the Government on its construction projects, to the detriment of the workers. Such was the evil at which the Act was directed. As stated by the House committee in reporting the bill that became the law, "This bill is aimed at the suppression of the so-called 'kick-back racket' by which a contractor on a Government project pays his laborers wages at the rate the Government requires him to pay them, but thereafter forces them to give back to him a part of the wages they have received." H. Rep. No. 1750, 73d Cong., 2d Sess.[3]

---

[3] Senator Copeland, in charge of the bill in the Senate, explained its purposes as follows: "I should be unwilling to have the bill passed without the Senate understanding its purpose. Much has been said on the floor recently about what is known as the 'kick-back' where employers or sub-employers have indecently and immorally taken from employees a part of the wage which it was supposed they were being paid. The testimony before our committee investigating crime is so startling as to indicate that as much as 25 percent of the money supposed to be paid out of Federal funds for employment is actually repaid to employers in this improper manner. The purpose of the bill is to attempt to put some check upon that practice." 78 Cong. Rec. 7401. Senator Copeland also quoted from a letter from Mr. William Green, President of the American Federation of Labor, stating, "It has been a common practice for contractors constructing Fed-

It is thus apparent that the purpose of the Act is to insure that workers on federal projects shall receive the full wages to which they are entitled from their employers, many of whom had been found to be depriving the workers of their rights in this respect. And the sanctions of the Act are directed toward that problem. There is nothing in the legislative history to support the thesis that the statute was intended to affect legitimate union activities. Nor was it intended to be used to punish unlawful acts, including those committed by union officials in violation of union rules, that are not in the nature of kickbacks.[4] We need not here attempt to delineate the

eral buildings to pay the employees the prevailing rate as determined by the Secretary of Labor, and then have them return a certain amount to the contractor. That is a most vicious practice." *Id.*

Representative Sumners, the chairman of the House committee in charge of the bill, referred to the bill as follows: "May I suggest to gentlemen on both sides of the House that we are going to attempt to call up on the first opportunity S. 3041, which is known as the 'kickback' bill, preventing contractors from compelling workmen to return a part of their salaries." 78 Cong. Rec. 10521.

[4] The United States points to certain isolated references in the legislative hearings concerning dishonest union practices. Hearings, Subcommittee of Senate Committee on Commerce, S. Res. 74, 73d Cong., 2d Sess., Vol. 1, pp. 35, 82, 808, 814, 826. But these relate to general "racketeering" in labor unions or to connivance between union officials and contractors on the matter of kickbacks, neither of which is involved in this case. Thus Adolph Dzik, attorney for the anti-racketeering committee of the American Federation of Labor building trade unions in New York, testified as follows (*Id.*, pp. 808, 814):

Mr. Daru [counsel for Senate Subcommittee]. Do you think it is usually a dishonest contractor or an employee, superintendent, or otherwise, who is sandwiching in between there and getting the "kickback"?

Mr. Dzik. I think it is the contractor and some of the officials of the unions.

The Chairman. Is it your opinion that there is connivance between the contractor or his representative and certain officials?

Mr. Dzik. I think so.

. . . . .

The Chairman. I take it from what you say that you are placing responsibi"ty largely upon the contractors, or do you also

degree, if any, to which the Act applies to the activities of trade unions and their officers. Nor need we question the fact that such officers on occasion may make unwarranted use of their powers, thereby reflecting adversely upon the reputation of unionism. It is enough to note that this Act was designed solely to prevent workers from wrongfully being deprived of their full wages and that evils relating to the internal management of unions were matters with which Congress did not concern itself in enacting the Kickback Act. Accordingly the broad language of the statute must be interpreted and applied with that background in mind.

From a superficial standpoint, the facts in the indictment would indicate that the appellees did induce the laborers to give up part of their lawful wages by threatening to procure their dismissal. But the facts as charged must be considered in light of the closed-shop agreement between the appellees and the contractors. That agreement, so far as appears, was a lawful one, giving the appellees the power as union representatives to insist that all laborers be or become members of Local 39 and the International Union. The initiation fee which was assessed is a normal and usual assessment by a union on a person seeking a union job or membership in the union. There is no claim in this instance that the fee was unauthorized, excessive or otherwise improper; in fact, it is admitted that when the full amount of the initiation fee was paid the laborer became enrolled as a member of both

---

include in your criticism, collusion between the contractors and the officers of various unions?

Mr. Dzik. I will say that primarily the contractors themselves are responsible, and that they corrupt the officials of the unions and in that manner are able to do it without being exposed. I will tell you why I say that, Senator. I say that if the officials and labor unions were really interested in this racket, they would immediately pass a resolution suspending the operation of the rule of the union punishing the laborers that exposed it.

See 46 Col. L. Rev. 326.

Local 39 and the International Union. The indictment is directed only to those payments made by laborers who discontinued working before they paid the last installment. As to such installments, there is no allegation that the failure to return them was unauthorized by union rules or was in any other way unlawful. Moreover, the fact that the assessments were accompanied by a threat and a power to procure dismissal for failure to pay is but an ordinary incident of the apparently legal closed-shop agreement. The sum of these facts, therefore, fails to reveal any of the evils which gave rise to the Kickback Act. All that appears are the normal methods used to implement the legitimate objective of a closed shop. The District Court so viewed the facts. It interpreted the indictment as dealing only with ordinary union initiation fees rather than with kickbacks, as that word is used in the context of this statute. We are bound by that interpretation on this appeal. *United States* v. *Borden Co.,* 308 U. S. 188.

The crucial fact relied upon by the United States, however, is the alleged failure of the appellees to report or to account to the unions as to those payments made by laborers who quit before making the last installment. But if that fact be true it cannot operate retroactively to make the assessments illegal or to give them the character of kickbacks. It must be assumed from the indictment as construed below that the assessments were lawful when made and that the appellees had the right to make them on behalf of the unions. If the appellees thereafter con verted the money to their own use in violation of union rules, the evil falls outside the scope of the Kickback Act. Embezzlement and failure to obey union rules are matters vastly different from an unlawful demand upon an employee to return part of the wages he has earned. Congress has given no indication in this Act that it desired to deal with such matters.

The interpretative process would be abused and the legislative will subverted were we to deal with the broad

language of this statute in disregard of the narrow problem of kickbacks which Congress sought to remedy. See *Holy Trinity Church* v. *United States,* 143 U. S. 457; *Chatwin* v. *United States,* 326 U. S. 455. The judgment of the District Court must therefore be

*Affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER dissenting, with whom MR. CHIEF JUSTICE STONE and MR. JUSTICE BURTON concur.

Until 1907 no review could be had from a judgment of a district—or the predecessor, circuit—court setting aside an indictment. By the Criminal Appeals Act of that year, 34 Stat. 1246, 18 U. S. C. § 682, this Court was given jurisdiction to review such a judgment, but only if the decision of the district court was based exclusively upon the invalidity or construction of the statute which gave rise to the indictment. If the district court construed an indictment as well as a statute, this Court could not entertain the appeal. *United States* v. *Hastings,* 296 U. S. 188. Accordingly, when the dismissal of an indictment involved an erroneous ruling in whole or in part upon the sufficiency of the indictment as a matter of pleading, the United States was without remedy. The upshot was that justice might be thwarted through a misconception by a district judge of the requirements of criminal pleading because time might bar a new indictment.

It was the purpose of the Act of May 9, 1942, 56 Stat. 271, 18 U. S. C., Supp. IV, § 682, to meet this situation. This Act authorized the Government to appeal to a circuit court of appeals from the decision of a district court in those cases where direct appeals to this Court do not lie. It also required this Court to remand to a circuit court of appeals a case wrongly brought here. Ac-

cordingly, when the terms of the dismissal of an indictment by a district court raise doubts as to the ground on which the dismissal was made, or is a blend of a finding of bad pleading and of a construction of the statute on which the indictment was based, this Court since the 1942 Act, is under duty not to affirm the district court but to remand the cause to the circuit court of appeals for that court's disposal of both issues—interpretation of the indictment and construction of the statute.

The Court applied this procedure in *United States* v. *Swift & Co.*, 318 U. S. 442, although, or perhaps because, there was a division here as to the meaning of the District Court's action. This course, in my judgment, should now be followed. The scope of the opinion below is certainly not unequivocal. Did the District Court mean that the indictment charged that the defendants acted exclusively as authorized agents of the union in collecting fees, but converted those fees to their own purposes? That may well be embezzlement under the Massachusetts law; but no one would contend that it comes within the terms of the "kick-back" statute. Or, did the District Court read the indictment to mean that that which the defendants did was outside the scope of their authority as union officials and was not done on behalf of the union, and hold that the "kick-back" statute does not apply to persons because they are officers of a union? Or, did the District Court read the indictment to mean that the union officials acted on their own and not for union purposes, but hold that such conduct is not covered by the "kick-back" statute because it applies exclusively to persons who work for the employer and who line their pockets by virtue of their power to assure or withhold employment? Instead of starting with an unequivocal construction of the indictment by the District Court, this Court is itself in effect construing the indictment when Congress has withheld from this Court the right to construe indictments.

In view of such doubts concerning the real meaning of what the District Court did, fair administration of the criminal law would seem to preclude affirmance of the judgment below on the assumption that the District Court read the indictment so as to bring into application a construction of the "kick-back" statute for which the Government does not contend. I would dismiss the appeal and remand the District Court's judgment to the Circuit Court of Appeals for the First Circuit for that court to review the judgment in view of the power of the Circuit Court of Appeals, not possessed by us, to construe the indictment as a preliminary to construing the statute.

But under the compulsion of the Court's decision the case is before us on the merits. See *Helvering* v. *Davis*, 301 U. S. 619, 640. The statute seems to be clear: "Whoever shall induce any person employed in the construction, . . . of any . . . work financed in whole or in part by loans or grants from the United States, . . . to give up any part of the compensation to which he is entitled under his contract of employment, by force, intimidation, threat of procuring dismissal from such employment, or by any other manner whatsoever, shall be fined . . . or imprisoned . . . or both." 48 Stat. 948, 40 U. S. C. § 276b. No legislative history is invoked to undo the scope of this language and to immunize what Congress has plainly condemned. What Congress has enacted should be enforced. The statutory phrase is "by any other manner whatsoever." The indictment does not describe a check-off or collection of union dues or initiation fees in a labor union. That, as the Government agrees, is not prohibited. The statute seeks to protect forays against wages derived from federal funds and does not touch diminution of such wages in connection with union membership. The statute is for the protection of the laboring man and the taxpayer. It should be so interpreted and enforced. It should not be interpreted so

as to protect those described in the indictments as collecting funds by coercion, through their control over jobs, for their own personal advantage at the expense of the wage earner, the labor union, and the taxpayer.