### WOODBURY v. UNITED STATES.
#### No. 1354.

District Court, D. Massachusetts.
Feb. 25, 1948.

William J. Fitzgerald, Taylor & Foley and Alfred W. Howes, all of Boston, Mass., for libellant.

William T. McCarthy, U. S. Atty., and Edward O. Gourdin, Asst. U. S. Atty., both of Boston, Mass., and John T. Casey, Atty. Dept. of Justice, of Washington, D. C., for respondent.

WYZANSKI, District Judge.

This is a libel in personam in admiralty under the Public Vessels Act, 43 Stat. 1112, 46 U.S.C.A. § 781 et seq.

### Findings of Fact.

1. On the morning of May 9, 1946, the fishing vessel, Ariel, owned by the libellant and being in all respect seaworthy and properly equipped and carrying a radio was engaged in dragging for fish in Ipswich Bay off the coast of Massachusetts. The weather was fair, the sea smooth, and the visibility clear. Several other fishing vessels were in the vicinity.

2. The area in which the Ariel was engaged had been designated by United States Coast and Geodetic Survey Chart No. 1206 as submarine operating area "D". The chart contained a notation to the following effect: "Limits and designations of submarine operating areas are shown in color. As submarines may be operating in these areas, vessels should proceed with caution. Customarily advance notice of such operations is broadcast from U. S. Navy radio stations."

3. The United States Navy submarine, Sea Owl, entered the area from the north and at 9:08 a. m. rendezvoused with the U. S. S. Falcon, a submarine rescue vessel. The Falcon took station 1,000 yards on the port beam of the Sea Owl, and broke out the International Flag Hoist, How and Peter, from both yardarms, a height of about 80 feet above the surface of the water. This flag hoist signifies: "Submarines are exercising in this vicinity; you should navigate with great caution." International Code of Signals (H. O. No. 87), Vol. 1, p. 37.

4. Proceeding under orders to conduct routine diving tests after a period of Navy Yard overhaul, the Sea Owl submerged to a depth of 60 feet on a course of 180 degrees true at 10:06 a. m. At this depth one periscope extended six feet above the water, a second periscope was just awash, and a radio antenna extended about 10 feet above the water. The Sea Owl surfaced at 10:25, reversed course to 000 degrees true at 10:27 placing the Falcon on its starboard beam, and at 10:43 submerged again to a depth of 60 feet. At 10:45 the submarine's periscope picked up the Ariel on an easterly crossing course at a distance variously estimated from 900 to 1,500 yards but which I find to be nearer 1,500 yards on a relative bearing of 324 degrees which was unchanging.

5. On sighting the Ariel and realizing the danger, the commanding officer ordered the submarine up to 50 feet in hopes that exposing both periscopes would alert the Ariel to the submarine's presence and her course. After about a minute in which the Ariel gave no evidence of diverting her course, the commanding officer ordered the submarine down to 80 feet. The submarine's sound gear tracked the Ariel approaching on the port bow, lost her, and picked her up again on the starboard quarter. A moment later about 10:50, there was a sharp scraping sound as the submarine's superstructure became entangled in the Ariel's dragnet. The submarine came to periscope depth to find the Ariel being towed astern by the net.

6. At the time of the collision the Ariel had been on a constant course a little south of East at a constant speed of about 2½ knots for at least a half hour. Her master was in the pilot house and a lookout was

stationed forward. They were both aware of the submarine's presence in the area, having sighted her when she first entered the area and several times thereafter and as late as about 10:40, 10 minutes before the collision; but, having made no effort to keep a constant check on her position, they were not aware of her immediate proximity.

7. It was customary in this area that whenever a submarine's activities endangered fishing vessels, either the submarine or its escort vessel would come within hailing distance and warn the fishing vessel. It was usual for the escort vessel to remain constantly between the submarine and the fishing vessel.

8. The Ariel was carrying no signals of any kind to indicate that she was towing a dragnet.

9. As a result of the submarine striking her net the Ariel was snubbed short and hauled down on her starboard side. Her master ordered the net wires slackened and came around onto the same course as the submarine. When the submarine came to periscope depth, the wires were cut to avoid running up on the submarine's deck.

10. The Ariel's fishing gear which was practically new and had been in excellent condition became a total loss. Her owner was deprived of the profits of four to five days' fishing while new equipment was being procured and installed. The cost of replacing the equipment was $1,538.98. The loss of gross profits for the period of enforced inactivity was $250; and the proportion of overhead costs allocable to the same period was $50. The submarine was also slightly damaged but no counterclaim for such damage has been filed.

### Conclusions of Law.

■■ 1. The commanding officer of the submarine was negligent in the operation of his vessel. This conclusion is based in part on his conduct in submerging on a course which he knew or should have known from observations of the Ariel's course, speed, and bearings would bring the submarine into dangerous proximity to the Ariel. The submarine's ability to dive under vessels in her course will not serve to excuse the commanding officer in this instance because he believed that the Ariel was a fishing vessel and from observations of her conduct and the location should have taken into account the possibility that she was towing a dragnet. Nor will the prudence of his actions once he realized the danger excuse him, the doctrine of in extremis not being available because of prior fault. Tidewater Associated Oil Co. v. United States, D.C., S.D.Cal., 1945, 60 F.Supp. 376. This conclusion of negligence is further based on the custom prevailing in the area for submarines to warn fishing vessels of danger, and the Sea Owl's failure to signal to the Ariel verbally, visually or in any other fashion. The signal, How and Peter, carried by the Falcon means only that a submarine is in the area, and at best would serve only as a warning to keep clear, not as a warning that a submarine is diving in your direction. The United States is liable for damages caused by the negligence of personnel of public vessels as well as damages caused by the public vessel as a physical instrument under the Public Vessels Act. Canadian Aviator Ltd. v. United States, 324 U. S., 215, 65 S.Ct. 639, 89 L.Ed. 901; American Stevedores v. Porello, 330 U. S. 446, 67 S.Ct. 847.

■■ 2. The Ariel was not contributorily negligent. Her failure to display any signals was not a breach of any duty. It is true that Pilot Rule 312.18, Rules to Prevent Collision of Vessels and Pilot Rules for Certain Inland Waters of the Atlantic and Pacific Coasts and of the Coast of the Gulf of Mexico (Ed. March 1946) p. 43, requires certain signals of a "vessel having" a "submerged object in tow" and that such Pilot rules having been adopted pursuant to Act of June 7, 1897, 30 Stat. 102 as amended by Act of May 25, 1914, 38 Stat. 381, 33 U.S.C.A. § 157, have the force of statute. Belden v. Chase, 150 U.S. 674, 698, 14 S.Ct. 264, 37 L.Ed. 1218; The Varanger, 4 Cir., 50 F.2d 724. But that rule does not apply to dragging nets carried by fishing trawlers. While the phrase "submerged object in tow" may appear broad enough to sweep within its reach every possible kind of object pulled or carried under water by vessel, the phrase may

832

also be read more narrowly as including only those submerged objects which are no part of the regular equipment of the vessel doing the pulling or carrying. The narrower view is to be preferred for several reasons. Trawlers and like fishing vessels with a net for dragging are in common experience regarded as belonging to a special class of vessel. They present quite different problems of danger. They are customarily treated separately in rules of navigation. Cf. International and Inland Rules, set forth in 33 U.S.C.A. §§ 79(d) and 178 and International Rule, set forth in 33 U.S.C.A. § 79(k). And when Pilot Rule 312.18 was proposed for adoption and was adopted, those concerned with its promulgation were mindful of entirely different types of tows and gave notice only to wrecking and salvage and not to fishing interests. [Communication from Commandant of Coast Guard, February 17, 1948 incorporated in this record by consent of the parties]. Thus despite a broader interpretation which the rule might be given by a person familiar only with dictionary definitions, it would be contrary to the intent of the rule to read it as covering nets of trawlers. Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226; Markham v. Cabell, 326 U. S. 404, 409, 66 S.Ct. 193, 90 L.Ed. 165; Chatwin v. United States, 326 U.S. 455, 464, 66 S.Ct. 233, 90 L.Ed. 198; United States v. Carbone et al, 327 U.S. 633, 642, 66 S.Ct. 734, 90 L.Ed. 904; Heydon's case, 3 Reprint 7a(1584).

3. The libellant is entitled to recover the full value of the fishing gear lost in the collision or $1,538.98. The libellant is further entitled to recover $250 on account of the loss of profits. The Potomac, 105 U.S. 630, 631, 632, 26 L.Ed. 1194; Agwilines Inc. v. Eagle Oil & Shipping Co., 2 Cir., 1946, 153 F.2d 869, 870; Restatement, Torts, § 912. He is not entitled to recover the allocable portion of his overhead costs. Although such costs were considered a proper element of damages in Guibert & Sons v. British Ship, George Bell, D.C.Md., 1880, 3 F. 581 that was a case of total loss, and probable earnings had been specifically disallowed in the computation of damages. In the case at bar, the libellant is being allowed the amount of gross profits for which such overhead costs were expended and can not be allowed a double recovery.

Judgment for libellant for $1,788.98 and costs.