## LATVA v. NICOLLS.

Misc. Civ. No. 52–49.

United States District Court
D. Massachusetts.

Aug. 6, 1952.

Frederick Cohen, of Boston, Mass., for petitioner.

Philip T. Jones, of Boston, Asst. U. S. Atty., and Albert E. Reitzel, of Washington, D. C., Asst. Gen. Counsel of United States Department of Justice Immigration and Naturalization Service, for respondent.

WYZANSKI, District Judge.

Petitioner, having been ordered deported under § 22 of the McCarran Act, (the Internal Security Act of 1950, 64 Stat. 987, 1006 amending § 1(2) (c) and § 4(a) of the Act of October 16, 1918, as amended by 40 Stat. 1012, 41 Stat. 1008 and 54 Stat. 673; 8 U.S.C.A. § 137(c) (i) and § 137-3(a); 50 U.S.C.A. § 781, which provides for the deportation of "any alien who was at the time of entering the United States, or has been at any time thereafter, a member of * * * The Communist Party of the United States", [8 U.S.C.A. §§ 137(c) (i), 137-3(a)] applies for a writ of habeas corpus to discharge him from the custody of the Attorney General's subordinate.

In this Court the record consists of the transcript of proceedings before the Department of Justice, and includes the warrant for arrest dated November 20, 1949, a charge lodged January 15, 1951 by Hearing Officer J. W. Kinnevan, hearings held before that officer the same day, a decision by him March 2, 1951, an order and an opinion dated August 15, 1951 issued by Assistant Commissioner of Immigration and Naturalization Devaney, and an opinion dated April 15, 1952 by the Board of Immigration Appeals dismissing an appeal from the Assistant Commissioner's order. The Hearing Officer, the Assistant Commissioner, and the Board have all found that petitioner is an alien who in 1934 or 1935, after his entry into the United States, became a member of the Communist Party; and all these authorities concluded that he was therefore deportable under the cited provision of § 22 of the McCarran Act.

The findings, buttressed by the evidence on every material point, show these facts. Karl Assari Latva was born a Finnish citizen in Finland, January 13, 1903. At 13 years of age he, with his grandparents, entered the United States to join his parents in Guild, New Hampshire. On September 16, 1922, he married a native American. They have two adult sons who served with, and were honorably discharged from the United States armed forces in World War II. Latva himself is a loom-fixer of good reputation, who has never been arrested for any offense other than for minor traffic violations. In 1941 he filed a declaration of intention to become an American citizen; in 1949 he filed a petition for citizenship, which is still pending.

In August 1949, principally, if not exclusively, to follow up that petition for Naturalization, Investigator John B. Daley interviewed Latva at the mill where he was working. Latva voluntarily stated that he joined the Communist Party "about 1934 or 1935". He received a membership book or card, "paid an original fee of about 50 cents", and paid "10 cents a month for about four months." He was not an officer. "The State officers (of the Communist Party) came (to Newport, where Latva then lived) from Concord, N. H., once a month to get the group active but they never could. * * * The local branch never functioned. Whenever the Finnish workers had a coffee party on Sunday afternoon, the Communist officers would come from Concord and answer any questions that might be asked." They left Communist literature on the table. "In the Finn Hall * * * we (the alien and his Finnish-born friends) had some posters with the Russian flag in (sic) it." The posters had English Slogans, "Fight against War and Fascism—Russia leads the way" and "Fight against Hunger". "The State officers asked me (Latva) to help get it (The Communist Party) organized here but I never took any interest". Latva never asked anyone to join the Communist Party. He understood the aims and purposes of the Communist Party were "organizing unions, and if there was a strike they ap-

pealed to all local groups to raise funds to help the strikers." He also believed the Communist Party "was a political party. But we here never took any part in politics because so few of the Finns could talk English". To his knowledge the Communist Party did not advocate the violent overthrow of organized government. There was no evidence offered as to the program or practices of that party in 1934 or 1935.

Petitioner's application for a writ of habeas corpus rests principally on the contention that his case does not fall within the interpretation given to the precursor of § 22 of the McCarran Act by Harisiades v. Shaughnessy, 1952, 342 U.S. 580, 72 S.Ct. 512, because in the instant case the Department of Justice has not shown that in 1934 and 1935 the Communist Party was a revolutionary conspiracy directed by an unfriendly foreign power, and because the Department has not shown that, if it were such a conspiracy, the alien adhered to it with knowledge of its character or with information from which a reasonable, prudent person in his situation would have derived knowledge. These are the points to which this opinion is addressed. The other issues tendered by petitioner, (such as the asserted invalidity of the Statute because of its retroactivity and its invocation of what petitioner describes as "guilt by association",) are disposed of by Harisiades and American Communications Ass'n v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925, or relate to problems of an evidentiary nature, (such as the admissibility and weights of certain testimony,) to which the opinions in Bilokumsky v. Tod, 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221 and United States ex rel. Vajtauer v. Commissioner of Immigration 273 U.S. 103, 47 S.Ct. 302, 71 L.Ed. 560 give the oft-reiterated answer.

█ 1. The initial premise is that under accepted principles of international and domestic law a sovereign has wide discretion in determining how long and under what conditions an alien may remain within the United States. Harisiades v. Shaughnessy, 342 U.S. 580, 587, 588, 72 S.Ct. 512, 517, 518, (and authorities cited notes 11,

14). But, by virtue of our Constitution, this power is subject to the due process clause of the Fifth Amendment. 342 U.S. at pages 584–591, 72 S.Ct. 512, 516, 520; Carlson v. Landon, 342 U.S. 524, 537–542, 72 S.Ct. 525, 532–535. And, though there may be some room for a contrary argument, it is my opinion that the Constitution imposes not merely procedural restraints but some substantive restraints, such as the First Amendment. See the authorities cited by Mr. Justice Douglas, dissenting in Harisiades v. Shaughnessy, 342 U.S. 580, 598–599, 72 S.Ct. 512, 523–524 (but see the opinion of Mr. Justice Frankfurter in the same case, 342 U.S. at pages 596–598, 72 S.Ct. 512, 522–524, and his assumption that deportation of permanent residents, like admission of aliens, is completely at Congressional mercy). It would, therefore, appear doubtful whether Congress could order the deportation of a resident alien on the ground that he had discussed an ordinary political issue, Cf. Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192, or had attended an open rally of a normal political party. Compare Jackson, J. in Harisiades, 342 U.S. 580, 592, first full paragraph, 72 S.Ct. 512, 520. The rationale for this result would be this: Freedom of speech is a protected right, under the First Amendment. Its protection is for the benefit not merely of the alien who speaks and the alien or citizen who listens, but for the whole of our society. See, Chafee, Free Speech in the United States p. 234. And this right rises to the status of a legally enforceable privilege when the alien has permanent residence and the attempted interference is as drastic as a proposed deportation order. There are, to be sure, intimations to the contrary in Mr. Justice Frankfurter's opinion in Harisiades v. Shaughnessy, 342 U.S. 580, 597, 72 S.Ct. 512. They must be read in their context. A court which showed the perceptiveness of footnote 4 of United States v. Carolene Products Co., 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234, would recognize the need for judicial protection of the liberties of a resident alien who has been allowed to become incorporated in our society, but has not yet been given political voting

rights. See Harisiades, 342 U.S. at page 586, note 10, 72 S.Ct. 512, 517.

■ 2. Protection of freedom of speech does not, however, necessarily involve a completely parallel protection of freedom of association. See American Communications Ass'n v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (see especially the discussion at the end of Part I of the concurring opinion of Mr. Justice Jackson); Joint Anti-Fascist Refugee Committee v. McGrath 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817; Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; Adler v. Board of Education, 342 U.S. 485, 492, 505, 507, 72 S.Ct. 380. Compare Lincoln Federal Labor Union v. Northwestern Iron & Metal Co., 335 U.S. 525, 69 S.Ct. 251, 93 L.Ed. 212. See The Open Window and The Open Door, 35 Calif. L.Rev. 336.

3. Association by an alien with the Communist Party at a time when it has been judicially found to be engaged in a conspiracy to overthrow the United States is a valid ground for deportation, even though the association terminated before the deportation proceedings began. Harisiades v. Shaughnessy, 342 U.S. 580, 72 S.Ct. 512.

4. The principle just stated does not automatically cover the instant case because here there is no express judicial or legislative finding that in 1934 when Latva was associated with the Communist Party it was a criminal conspiracy. But there are two alternative paths by which the principle justifiably can be extended to cover the present case.

■ First, previous to 1934, Congress had provided for the deportation of an alien who became a member of "any organization that * * * advocates the overthrow by force or violence of the Government of the United States". §§ 1 and 2 of Act of October 16, 1918, 40 Stat. 1012, 8 U.S.C.A. §§ 137, 137–1. See Harisiades 342 U.S. at page 593, 72 S.Ct. 512, 521. The weight of judicial authority was to the effect that this general language embraced membership in the Communist Party as it functioned in 1934, or shortly before then. Murdoch v. Clark, 1 Cir., 53 F.2d 155, 157; United States ex rel. Yokinen v. Commissioner, 2 Cir., 57 F.2d 707; Ex parte Jurgens, D.C.Minn., 17 F.2d 507; Compare United States v. Tapolcsanyi, 3 Cir., 40 F.2d 255. But see Schneiderman v. United States, 320 U.S. 118, 157, 63 S.Ct. 1333, 87 L.Ed. 1796. These cases and the administrative and judicial reasoning on which they were based were known to Congress. See Department of Labor, Appropriation Bill for 1936, Hearings 74th Congress, 1st Session, page 96. And the findings of fact in § 2 of the Internal Security Act of 1950, 50 U.S.C.A. § 781, may reasonably be regarded as a legislative determination of the subversive character of the Communist Party not merely in 1950 but as of two decades earlier. In short, there is ground for concluding that here as in Harisiades there is the necessary factual basis for holding that the Communist Party at the critical date was a criminal conspiracy. Martinez v. Neelly, 7 Cir., 197 F.2d 462. See The Communist Party and The Law, The Atlantic Monthly May 1951. Compare Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L. Ed. 1137; American Communications Ass'n v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925.

■ Second, even if at the precise time in 1934 when Latva was associated with the Communist Party, it was not a conspiracy, it was such an organization that Congress, without violating the First or Fifth Amendments to the Constitution, could regard association with it as an adequate basis for deportation even of permanent alien residents. The Party in 1934 had ties with a foreign government, or at least with foreign political parties; it had been founded by men who avowedly subscribed to an international program for the militant defense of the rights of the proletariat; and its activities in other parts of the world had included violence. In dealing with aliens, while it is, in my view, not free of the restraints imposed by the First and Fifth Amendments to the Constitution, Congress may exercise a closer scrutiny than it can of citizens. Having regard to their background, their suitability for incorporation into our body poli-

tic, and their duty before becoming American citizens to show affirmatively their attachment to the principles of the Constitution of the United States, Congress can terminate the residence of such aliens as enter political groups subordinated to a foreign government or foreign party, and indoctrinated with the teachings of violence, even though the violence so taught be regarded as purely defensive.

5. Having such power to terminate the residence of aliens who have at any time been members of the Communist party, did Congress intend that its legislation should reach those aliens who for a short period, years ago, became technical members of the party without understanding its conspiratorial character, or knowing of its subordination to a foreign power, or subscribing to its doctrines of violence, defensive or otherwise?

■■ The words of the McCarran Act are broad enough to support an affirmative argument. The contention to the contrary rests, first, on the disclosed history and purpose of the legislation. The clause in question, as is pointed out by Mr. Justice Jackson in Harisiades v. Shaughnessy, 342 U.S. 580, 593, 72 S.Ct. 512, 520, was the legislative response to Kessler v. Strecker, 307 U.S. 22, 59 S.Ct. 694, 83 L.Ed. 1082 (argued by Jackson S. G.). The immediate object of Congress was to declare that an alien who had been a full-fledged, conscious member of the Communist Party, and had resigned, did not by his resignation gain immunity from deportation. But, so it is contended, Congress, as the findings and operative sections of the McCarran Act reveal, did not have within its focus one who had joined the Party without an awareness of its purposes and character. To suppose that Congress meant to reach aliens in this latter class is unreasonable. The legislative history does not support the supposition. The earlier judicial rule was probably against such inclusion. Compare United States ex rel. Kettunen v. Reimer, 2 Cir., 79 F.2d 315. So extensive a change in that rule would be in conflict with the settled common law and statutory doctrine that one is not regarded as a conspirator if he becomes associated with criminals but does not know their criminal purposes and adhere to them. Compare Part I of Jackson J.'s opinion in American Communications Ass'n v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Crimmens, 2 Cir., 123 F. 2d 271. Therefore, the point is pressed that this Court should follow that principle of equitable statutory construction familiar since Aristotle's Nicomachean Ethics v. 1137b. 19, "When the law speaks universally, and a case arises on it which is not covered by the universal statement, then it is right, where the legislator fails us and has erred by over-simplicity, to correct the omission, to say what the legislator himself would have said had he been present, and would have put into his law if he had known * * * And this is the nature of the equitable, a correction of law where it is defective owing to its universality". "The policy as well as the letter of the law is a guide to decision. Resort to the policy of a law may be had to ameliorate its seeming harshness or to qualify its apparent absolutes." Markham v. Cabell, 326 U.S. 404, 409, 66 S.Ct. 193, 195, 90 L.Ed. 165; Chatwin v. United States, 326 U.S. 455, 462–464, 66 S.Ct. 233, 90 L.Ed. 198; Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226; Heydon's Case, 3 Coke Rep. 7 (1584). Compare J. C. Gray, The Nature and Sources of the Law, 2nd ed. p. 179; Vinogradoff, Historical Jurisprudence, Vol. II, pp. 63–71; Aristotle, Rhetoric, Bk I, 13 p. 1374a; Frankfurter, Some Reflections on The Reading of Statutes, 2 The Record 213; 227 et seq. (1947). Special emphasis is placed upon these equitable considerations where the text of the statute, the legislative hearings, committee reports, and enacted findings, and the prior judicial history of the problem plainly disclose that Congress had an object different from the class wherein Latva falls, United States v. Carbone, 327 U.S. 633, 637–638, 66 S.Ct. 734, 90 L.Ed. 904, where the act is addressed to immigration issues, Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226, and where

the prescribed remedy, though not penal, is in the drastic form of deportation of long as well as short term residents, thus involving the problem of a second uprooting. Cf. Harisiades v. Shaughnessy, 342 U.S. 580, 587, 72 S.Ct. 512, 517.

Application of the letter of the law will here, as in thousands of cases, govern an alien who took the questioned step many years ago when he first arrived in the United States. He was then ignorant of our laws and of the precise political, economic, and social character of the different groups contending for his support. He was largely dependent for information on other aliens with the same background and many of the same limitations of knowledge. On learning more of our ways, he separated himself from evil companions, promptly and sincerely, not because he feared reprisals or planned to retain a secret connection. Compare Harisiades v. Shaughnessy, 342 U.S. 580, 593, 72 S.Ct. 512. He has a long record of faithful adherence to our Constitution and democratic policies. He reared children to serve America in the most patriotic and self-disregarding manner. Without pressure from any public or private authority, he freely bared his undiscovered and undiscoverable past, for the sole purpose of assuming the further burdens, as well as the precious advantages, of citizenship. Compare Harisiades, 342 U.S. at pages 585–587, 72 S.Ct. 512.

Argument in support of the literal construction of the statute begins with emphasis on the attitude displayed by a series of successive Congresses. A will to extirpate from our land every form of Communism, and all who have at any time taken any part in that conspiracy is shown by the collection of statutes cited by Frankfurter J. in note 15 Dennis v. United States, 341 U.S. 494, 551, 71 S.Ct. 857, 95 L.Ed. 1137. It was again shown in the re-enactment of the McCarran Act by the Immigration and Nationality Act, 66 Stat. 163, Act of June 27, 1952. See also The Communist Party and The Law, Atlantic Monthly, May 1951. This series of enactments throws light on "which choice is * * * the more likely that Congress would have made", Burnet v. Guggenheim,

288 U.S. 280, 285, 53 S.Ct. 369, 370, 77 L.Ed. 748, if in 1950, when the McCarran Act was passed, cases like Latva's had been placed squarely in issue.

The inference unfavorable to the alien is strengthened by the limited exception to the wide sweep of the McCarran Act subsequently carved out by the clarifying provisions of the Act of Mar. 28, 1951, 8 U.S. C.A. § 137–9. When Congress exempted from deportation the alien who joined the Communist Party under 16, by operation of law, or for purposes of obtaining employment, food rations, or other essentials of living, the legislature plainly marked the limits of its grace.

Moreover, when in Section 244(a) (5) of Public Law 414, 82nd Congress, 66 Stat. 163, 8 U.S.C.A. § 1254(a) (5), the so-called Immigration and Nationality Act, of June 27, 1952, Congress provided that a former Communist who (1) had been physically present in the United States for no less than ten years, (2) proved that during that period he had been a person of good moral character, (3) had not been served with a final order of deportation, issued pursuant to that 1952 Act, and (4) satisfied the Attorney General that his deportation would result in unusual hardship to the alien or certain of his relatives, Congress inferentially indicated that until that Act became operative, even a person who had innocently joined the Communist Party in ignorance of its aims and practices was deportable; and that even after that Act became effective, only the Attorney General could relieve him of deportation, and then only under certain circumstances.

If judges were to increase the bounds of tolerance they would be making, not interpreting, law. Moreover, they would be opening an exit with dimensions imprecisely defined, and impractical of administration. Many aliens might claim they were ignorant of the conspiratorial quality of the Communist party. Against their allegations of innocence, the Government could offer little convincing proof, for cross-examination would be inconclusive; the testimony of the conspirators would perhaps be shielded by the Constitutional claim against self-incrimination; and

the evidence of informers or of recorded expressions of the alien's intent would ordinarily be unavailable.

The Government reminds us that deportation is in all lands an administrative process. No country requires conclusive evidence in controlling visits and residences of aliens. They are present not by inherent, unalienable right, but solely as the consequence of the free, uncontrolled will of the nation. See Freedom to Travel, The Atlantic Monthly, October 1952.

Moreover where the nation is free to dismiss former Communists it will do so. It has done so with employees in local and national governmental service. See Gellhorn, Security, Loyalty, and Science. They, like resident aliens, are beneficiaries of official bounty. See Adler v. Board of Education, 342 U.S. 485, 493, 72 S.Ct. 380; Garner v. Los Angeles Board, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317; Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817. And those cases show, by analogy, that Congress can and would terminate a favorable alien status, without proof of overt wrongful acts, but solely on proof of unreliability of associations. The legal privilege is subject to administrative determination not as to guilt, but as to prudence. The unwary are the unwanted.

"The for and the against" are nicely balanced. Yet scrupulous disregard of my personal views of what would be a wise immigration policy, complete devotion to standards of statutory construction appropriate for a judge, and due regard for my limited jurisdiction as a single judge sitting in an inferior court, See, A Trial Judge's Freedom and Responsibility, 65 Harvard Law Review, 1281, 1299, compel me to read the statute against the alien. This course is made inevitable for a District Judge coming to this problem so soon after the exhaustive consideration given to the precursor of this very enactment by the Supreme Court of the United States. Harisiades v. Shaughnessy, 342 U.S. 580, 72 S.Ct. 512. Compare Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525. Only those higher in commission can distinguish Harisiades on the ground that there the alien invoked "the principle of forgiveness and the doctrine of redemption", Douglas, J., dissenting in Harisiades, 342 U.S. at page 601, 72 S.Ct. 512, 525, while here the alien pleads the excuse of justifiable ignorance and moral innocence. Cf. Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240. Only a higher court can rule that in an omnibus bill, judicial exceptions to the letter of the law may be created for meritorious classes of cases. It is enough for me to note that in such catch-all legislation there is no factual warrant for assuming there was Congressional attention to Latva's class at any stage of the hearings, committee deliberations, or legislative voting.

In considering bail, I am mindful of these facts. The alien has indicated that if he were not successful in this Court he would take an appeal. The Government has stated it does not regard the enlargement of this alien during judicial proceedings as involving any possible danger. There is a chance of Congressional amendment of the law to exclude from its impact, (absolutely, and not merely at the discretion of the Attorney General,) the class of innocent resident aliens who joined the Communist Party decades ago in ignorance of the conspiratorial, disciplined, and captive character but who promptly and sincerely disaffiliated themselves on discovering the facts. There is a possibility that the Department of Justice may itself revise its policy and cancel the writ as it did in cases like United States ex rel. Boric v. Marshall, D.C.Pa. 4 F. Supp. 965, appeal dismissed, 3 Cir., 67 F. 2d 1020, petition for certiorari granted 290 U.S. 623, 54 S.Ct. 345, 78 L.Ed. 543, petition dismissed 290 U.S. 709, 54 S.Ct. 371, 78 L.Ed. 609. See Department of Labor, Appropriation Bill for 1936, hearings 74th Congress, 1st Sess., page 96. Considering all these facts, and also Rule 38 of the Rules of the Court of Appeals for this First Circuit, I direct that the petition for enlargement of the alien without condition be denied, but, unless the United States Attorney objects within 5 days, the alien shall be allowed at large on new bail in the same amount as the outstanding bail until the latter of these two events oc-

curs, either the appeal time expires, or my order denying the writ is finally adjudicated by the last appellate court to which the parties resort, and a mandate thereon is received in this Court. Nothing in this opinion or order shall interfere with such power as the Attorney General has to take into, and keep in, custody an alien pursuant to § 20(a) of the Immigration Act, as amended by § 23 of the Internal Security Act of 1950, 8 U.S.C.A. § 156(a). Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525.

Order in accordance with last paragraph of the opinion.*