**UNITED STATES of America, Plaintiff,**

v.

**Gerald WEINGARDEN, D.O., Donald Freedlander, D.O., Robert Gash, D.O., Harvey Golden, D.O., Richard Tapert, D.O., Henry Ellis, Sanford Hoskow, Charles Shermetaro, Maureen Hoskow, a/k/a Maureen A. Delaney, J.K.F., Inc., a Michigan Corporation, Media Technology, Inc., a Michigan Corporation, and Bernard Lampear, Defendants.**

Crim. No. 78–80689.

United States District Court,
E. D. Michigan, S. D.

April 5, 1979.

Peter M. Rosen, Ross Parker, Detroit, Mich., for plaintiff.

Neil H. Fink, Detroit, Mich., Warren J. Perlove, Robert S. Harrison, Southfield, Mich., Gerald D. Saunders, Detroit, Mich., Fred L. Harris, Southfield, Mich., Philip A. Gillis, Gillis, Louisell & Berg, Detroit, Mich., Terence V. Page, Clark, Hardy, Lewis, Fine & Asher, Birmingham, Mich., Michael H. Golob, Detroit, Mich., Albert J. Krieger, Miami, Fla., for defendants.

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR REHEARING

CORNELIA G. KENNEDY, Chief Judge.

Defendants were indicted by a United States Grand Jury upon a 37–count indictment, combined with a 42–count information, charging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, on September 21, 1978. Count 1 of the indictment charges conspiracy to acquire an interest in an enterprise and to participate in the affairs of an enterprise through a pattern of racketeering activities, in violation of 18 U.S.C. § 1962(d). Count 2 of the indictment charges a substantive violation of the provisions of 18 U.S.C. § 1962(b) (maintenance of an interest in an enterprise through a pattern of racketeering activities). Count 3 of the indictment alleges substantive violations of 18 U.S.C. § 1962(c) (conducting of and participation in the affairs of an enterprise through a pattern of racketeering activities). Counts 4 through 37 of the indictment each allege substantive violations of 18 U.S.C. § 1341 (mail fraud). Some or all of the substantive violations set forth in Counts 4 through 37 are relied upon by the government as predicate acts of racketeering necessary to charge and convict under 18 U.S.C. § 1962. On March 16, 1979, the court denied the motion of one defendant to dismiss the indictment, which incorporated by reference other defendants' motions to dismiss. On March 21, 1979, the United States Court of Appeals for the Fifth Circuit issued its decision in *United States v.*

*Porter,* 591 F.2d 1048 (5th Cir. 1979) (Coleman, J.). Relying on this case, counsel for defendants orally moved for a rehearing of the motions to dismiss. For the reasons stated below the court declines to follow *Porter,* and the motion for rehearing will be denied.

Defendants in the instant case were charged in the information counts with having violated 42 U.S.C. § 1396h(b)(1), which at the relevant time provided:

> (b) Whoever furnishes items or services to an individual for which payment is or may be made in whole or in part out of Federal funds under a State plan approved under this subchapter and who solicits, offers, or receives any—
>
>> (1) kickback or bribe in connection with the furnishing of such items or services or the making or receipt of such payment, . . .
>
> shall be guilty of a misdemeanor and upon conviction thereof shall be fined not more than $10,000 or imprisoned for not more than one year, or both.

Relying on *Porter,* defendants argued orally that "kickback" cannot refer to a payment made to a party other than the party which initially transferred the sum to the payor; and that since the alleged scheme involved no payments by doctors to the laboratories but only referral of specimens, the payments by the labs to the doctors were not illegal "kickbacks." Hence, defendants argue, the indictment and information charge no crime.

In *Porter,* eight doctors and one laboratory operator were charged with violating 42 U.S.C. § 1395nn(b)(1), in connection with a scheme of payments for supplying medicare services. In a typical transaction a physician would determine that tests for the presence of various diseases should be performed on blood samples taken from the patient. Two types of labs offered testing services—the manual type, with a number of machines each designed to do one test, and the automated type, with one machine capable of simultaneously performing an entire battery of tests. The manual labs charged significantly higher rates for the same service; for a particular blood test an automated lab would receive a medicare reimbursement of $35, while the comparable figure for a manual lab was $214. The doctors sent their blood samples to the manual lab operated by Porter, who paid the doctors up to $35 for each sample sent. Under the "AdServ" system employed by defendants, the doctors would be paid a "handling fee" (which the government contended was a bribe, kickback, or rebate) by a third party, AdServ, for submitting blood specimens from medicare beneficiaries and would accept lab work for non-medicare patients at a reduced price or at cost. "Under this arrangement, therefore," as the court noted, "the doctors profited and non-Medicare patients were subsidized by the Medicare Program." 591 F.2d at 1051. *Porter* holds that payments by a laboratory which received medicare fees and shared the fees with doctors who had referred their specimens to the lab, had not made "kickback" payments proscribed by 42 U.S.C. § 1395nn(b), which shares its language and legislative history with § 1396h(b)(1). The court stated that "kickback" ordinarily means "the secret return to *an earlier possessor* of part of a sum received" (591 F.2d at 1054; emphasis in original). Hence the court concluded that "once the labs lawfully received a lawful fee . . . there was no outstanding restriction on what the lab could do with the money once it received it." 591 F.2d at 1054. The court apparently reasoned that once the laboratory received the funds from medicare, payments by the lab to others would be "corrupt" only if paid to a governmental official or agent. *Porter* relies on dicta in *United States v. Zacher,* 586 F.2d 912 (2d Cir. 1978), for the proposition that a kickback (like a bribe, as *Zacher* makes clear) "involve[s] a corrupt payment or receipt of payment in violation of the duty imposed by Congress on providers of services to use federal funds only for intended purposes and only in the approved manner." 586 F.2d at 916, *quoted in* 591 F.2d at 1054.

■ The weight of the cases, however, indicates that the term "kickback" in both

legal and lay usage may refer not only to "a return of a part of a sum received . ." (*Webster's Seventh New Collegiate Dictionary,* 1969 ed.), *see also Boehm v. United States,* 123 F.2d 791, 813 (8th Cir. 1941) ("kick-back" defined as "(illegal) forced return of part of one's wages (colloq.)"), but also to the forwarding of a sum to a third party for services performed for the payor of the kickback by the third party payee (though the payee may not originally have given payor any payment). In fact, *Webster's Third New International Dictionary of the English Language Unabridged* (1971 ed.) defines "kickback," in part, as:

> 2: REFUND: as (a): a percentage payment exacted as a condition for granting assistance by one in a position to open up or control a source of income or gain (appointees paid a — to the ward boss out of each paycheck).

Thus where a vending company installed its cigarette machines in restaurants in a chain of which appellant was president, upon clandestine payments by the vending company to the appellant, such payments were permissibly labelled by a government witness as "kickbacks." *United States v. Engle,* 458 F.2d 1017, 1020 (8th Cir. 1972).

The Supreme Court, in *United States v. Brewster,* 408 U.S. 501, 522 n. 16, 92 S.Ct. 2531, 2542, 33 L.Ed.2d 507 (1972), has referred to the facts of *United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955), as "a Congressman's misuse of office funds via a 'kick-back' scheme." In *Bramblett,* defendant was indicted and convicted of violating 18 U.S.C. § 1001, by representing to the Disbursing Office of the House of Representatives that one Margaret M. Swanson was a clerk in defendant's Congressional office, and entitled to receive compensation, when she was not. (The facts are set out in the lower court's opinion, 120 F.Supp. 857, 858 (D.D.C. 1954).) In *Powell v. McCormack,* 395 U.S. 486, 525, 89 S.Ct. 1944, 1966, 23 L.Ed.2d 491 (1969), the Court noted that "The House of Commons had expelled Robert Walpole for receiving kickbacks for contracts relating to 'foraging the Troops,' . . . and committed him to the Tower." For similar references to kickbacks as misuse of government status to obtain payments through awarding of contracts (violations of the Kickback Act of 1934, subsequently amended), *see, e. g., United States v. Acme Process Equipment Co.,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966); *United States v. Carbone,* 327 U.S. 633, 66 S.Ct. 734, 90 L.Ed. 904 (1946).

The Sixth Circuit has often used the term "kickback" in this fashion. In *United States v. Thompson,* 366 F.2d 167 (6th Cir. 1966), defendants were members of a county council who solicited a particular architectural firm for the construction of a hospital under the Hill-Burton Act, 42 U.S.C. § 291 *et seq.,* and who requested a 1% kickback payment from the firm. In *United States v. Foster,* 566 F.2d 1045, 1050 (6th Cir. 1977), the court labels "kickbacks" those payments made by borrowers of bank loans to the defendants who were bank officers authorized to make loans on behalf of the bank; a portion of the loan proceeds was paid to defendants. *See also In re Grand Jury Proceedings, Detroit, Michigan, August, 1977,* 570 F.2d 562, 563 (6th Cir. 1978) (reference to "investigation of federal Medicaid fraud involving alleged kickback arrangements with nursing homes").

Indeed the Fifth Circuit as well has used the term in this way or referred to such usage. In *United States v. Joseph,* 533 F.2d 282 (5th Cir. 1976), Judge Tuttle in dissent quotes from a prosecutor's improper closing argument which resulted in a mistrial in *Dunn v. United States,* 307 F.2d 883 (5th Cir. 1962):

> '[H]ow was Mr. DeLaigle going to get the job? Mr. Dunn was the Mayor. He got them from Mr. Dunn. Whether those accounts (amounts?) (*sic*) were reimbursement for expenses or kickbacks— any of you gentlemen that know anything about politics, when you throw out that much money, why, somebody is going to have to take (pay?) (*sic*) somebody else.'

533 F.2d at 289 n. 2, *quoting* 307 F.2d at 885. In fact, *United States v. Beasley,* 550

F.2d 261, 273 n. 14 (5th Cir. 1977), cites the Sixth Circuit *Thompson* case, *supra,* giving the following thumbnail description: "(defendants . . . as members of county council, solicited and received kickback from architects on county hospital project under federal Hill-Burton Act in return for causing employment of architects for such project . . .)." In *United States v. Godwin,* 566 F.2d 975 (5th Cir. 1978), defendant, an employee of the United States Marshal's Service charged with guarding hospitalized prisoners, supervised other guards and prepared both his and their time sheets. On several occasions defendant-appellant filled out time sheets for periods when he and other guards were not in fact working, and submitted them to the United States Marshal's Office. "He and other guards were paid according to these submissions, and he received kickbacks from other guards." *Id.* at 976. The case of *ITT Community Development Corp. v. Barton,* 569 F.2d 1351 (5th Cir. 1978), involved a chief engineer for ITT who had taken kickbacks from local contractors in exchange for awarding ITT construction contracts for a building project. *Id.* at 1353. *United States v. Bush,* 503 F.2d 813 (5th Cir. 1974), decided by a panel which included Judge Coleman, the author of *Porter,* involved kickbacks paid to an influential member of a school board which was considering buying mobile classrooms, by a supplier of such classrooms. *See also: United States v. Addonizio,* 451 F.2d 49, 55 (3d Cir. 1971), *cert. denied,* 405 U.S. 1048, 92 S.Ct. 1309, 31 L.Ed.2d 591 (1972) (kickbacks from contractors for city building project); *Maheu v. Hughes Tool Co.,* 569 F.2d 459, 474 (9th Cir. 1977) (Robert A. Maheu, Howard Hughes' business associate, "received a kickback for arranging certain business deals on behalf of Summa [Hughes' company]. Such kickback arrangements would result in profit to Maheu at Summa's expense, Maheu having failed to pay the kickbacks to Summa . . .").

*Porter* cites (591 F.2d at 1054 nn. 4 & 5) several sections of the Internal Revenue Code referring to kickbacks paid to government officials: 26 U.S.C. §§ 162(c), 952(a)(4), 964(a), and 995(b)(1)(F)(iii). The term as there used is compatible with the modern dictionary definition of payment for assistance rather than strict refund or rebate. Thus § 162(c)(1) (part of 1971 amendment) provides in part:

No deduction shall be allowed under subsection (a) for any payment made, directly or indirectly, to an official or employee of any government, or of any agency or instrumentality of any government, if the payment constitutes an illegal bribe or kickback or, if the payment is to an official or employee of a foreign government, the payment would be unlawful under the laws of the United States if such laws were applicable to such payment and to such official or employee.

Subsequent references to "kickbacks," at 954(a)(4) and 995(b)(1)(F)(iii), refer to this section (payments "within the meaning of" § 162(c)). This large body of legal and lexicographical authority confirming a broader meaning for "kickback" is more persuasive than the bare analysis offered in *Porter.*

■■■ Further, this court cannot agree with *Porter* in its holding that the government has failed to demonstrate interference with any of its lawful functions in alleging that it was defrauded of its right to have the medicare program conducted honestly and fairly. 591 F.2d at 1057. Such doctrine is in direct conflict with the law of this and other circuits. *United States v. Thompson, supra; United States v. Levinson,* 405 U.S. 971 (6th Cir. 1968), *cert. denied,* 395 U.S. 958, 89 S.Ct. 2097, 23 L.Ed.2d 744 (1969); *United States v. Del Toro,* 513 F.2d 656 (2d Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). *See generally Hammerschmidt v. United States,* 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924); *Haas v. Henkel,* 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569 (1910). In addition, this court cannot agree with the inference drawn in *Porter* that because 42 U.S.C. § 1395nn(b) was amended in 1977 due to a Congressional desire for further clarification, the statute was insufficiently clear before amendment so as not to give ade-

quate due process warning that the conduct at issue was prohibited. 591 F.2d at 1054. Defendants in both that case and this were well informed of the essential elements of the charges against them and were able to defend themselves against the accusations. It cannot be said, therefore, that the challenged statutes were impermissibly vague. *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Debrow,* 346 U.S. 374, 376, 74 S.Ct. 113, 98 L.Ed. 92 (1953), *accord, United States v. Heller,* 579 F.2d 990, 998–99 (6th Cir. 1978).

Accordingly, defendants' motion for rehearing is DENIED.

IT IS SO ORDERED.