569 F.2d 1351
 ITT COMMUNITY DEVELOPMENT CORPORATION, a Delaware
Corporation, Plaintiff-Appellee,
v.
John BARTON, a/k/a John A. Barton, and Joan Barton, his
wife, Defendants-Appellants,
and
Dan R. Warren, Esq., Wilton R. Brinkley, Esq., and Judge &
Warren, P. A., Movants-Appellants.
 Nos. 76-2410, 76-3138.
 United States Court of Appeals,
Fifth Circuit.
 March 24, 1978.
 
 Joseph T. Garlovsky, Ormond Beach, Fla., for defendants-appellants.
 Tobias Simon, Theodore L. Tripp, Jr., and Elizabeth J. du Fresne, Miami, Fla., for movants-appellants.
 Charles A. Kimbrell, Frank A. Shepherd, Stanley J. Bartel, Miami, Fla., for plaintiff-appellee.
 Appeals from the United States District Court for the Southern District of Florida.
 Before GOLDBERG, TJOFLAT, Circuit Judges; and WYATT*, District Judge.
 TJOFLAT, Circuit Judge:
 
 
 1
 Dan R. Warren and Wilton R. Brinkley were adjudged by the district court to be in civil contempt of court and were remanded to the custody of the United States Marshal for failing to pay $99,076.71 into the registry of the court as required by a turn-over order. The turn-over order was entered by the district court during prejudgment garnishment proceedings that were being prosecuted against Warren and Brinkley, as garnishees, in conjunction with a diversity action between ITT Community Development Corporation (ITT) and John Barton and his wife, Joan Barton. The principal issue raised by these consolidated appeals[1] concerns the efficacy of the turn-over order; if it was invalid when issued, the civil contempt adjudication cannot stand. We find the turn-over order to have been invalid and reverse.
 
 
 2
 We note here that the Bartons, defendants in the main suit below, are not parties in appeal No. 76-3138. Although they are listed as parties in appeal No. 76-2410, they were dismissed by an administrative screening panel of this court from that appeal insofar as it questions the validity of the district court contempt order. The sole issue in which they are still involved as appellants, the propriety of a freeze order on the funds entered by the district court prior to the turn-over order, we hold, as will be discussed below, to be moot. See note 7 infra. In the interests of simplicity and clarity, we shall refer to Warren and Brinkley as "appellants" and, when necessary, to the Bartons by name.
 
 
 3
 * The procedural events that eventually culminated in the appellants' being found in contempt of court were quite bizarre indeed. Since these events bear on the validity of that finding, a recitation in some detail of the procedural history of this case is necessary.
 
 
 4
 This case began in the Circuit Court of Dade County, Florida, on March 21, 1975, when ITT instituted suit against the Bartons for money damages. In a six-count complaint, ITT set forth a variety of claims, all arising out of John Barton's employment as chief engineer on an ITT construction project called Palm Coast, which is on the northeast coast of Florida.[2] As ITT's chief engineer, Barton had been responsible for letting contracts for portions of the work to several local contractors and for supervising their performance of those contracts. Late in 1974, the complaint alleged, ITT discovered that Barton had received several hundred thousand dollars in the form of kickbacks from many of these contractors.[3] ITT's purpose in bringing suit was, therefore, to recover these monies and consequential damages.
 
 
 5
 Simultaneous with the commencement of its suit, ITT caused writs of garnishment to be issued and served on five banks known to have bank accounts of the Bartons.[4] One of these banks, the Barnett Bank at Ormond Beach, had issued, one week earlier, two cashier's checks to John Barton one in the sum of $40,000, the other for $59,076.71. Both checks were still in Barton's possession when the Barnett Bank received the writ of garnishment. On March 31, 1975, the Barnett Bank answered the writ, stating that it was not indebted to the Bartons for the amount of the cashier's checks because the checks were negotiable and would have to be honored by the Bank upon presentment by a holder in due course.
 
 
 6
 On March 24, three days after the commencement of ITT's action, John Barton employed the appellants, as attorneys, to defend the law suit, and on March 26 he endorsed the $40,000 cashier's check over to them. The next day, March 27, appellant Brinkley deposited the $40,000 cashier's check in his personal checking account and immediately issued his personal check in the same amount to appellants' law firm. A deposit of $30,000 was placed in the firm's general account and credited as a payment from the Bartons toward the fees and costs incurred and to be incurred in defending the ITT suit. The remaining $10,000 was placed in the firm's trust account to apply against any legal fees and expenses incurred in the defense of any criminal proceedings that might be instituted against the Bartons.
 
 
 7
 On March 28, the day after these transactions had been accomplished, ITT caused an emergency hearing to be convened in the Dade County Circuit Court in a belated effort to prevent the Bartons from negotiating the two cashier's checks drawn on the Barnett Bank and already negotiated. When the hearing commenced, the Bartons announced that earlier in the day they had filed a removal petition in the federal court below. When ITT indicated no objection to the petition (even though the Bartons had no standing under 28 U.S.C. § 1441 (1970) to seek removal), the circuit court acquiesced in the removal, and the proceedings were thus lodged in the district court.[5]
 
 
 8
 Several days later, on April 9, ITT caused additional writs of garnishment to be issued in this action; this time the appellants were served. On May 1, they answered the writs. Each appellant denied that he was individually indebted to the Bartons; however, appellant Warren, answering in behalf of appellants' law firm, stated that the law firm possessed certain books and records of the Bartons and that the firm was contingently indebted to John Barton in the amount of $10,000 for prepaid, nonassignable legal fees relating to the pending litigation with ITT. On May 12, ITT replied to these answers, asserting that the proceeds of the $40,000 cashier's check (including the $10,000 in prepaid fees) were already subject to a writ of garnishment, to wit, the writ served on the Barnett Bank on March 21. Alternatively, ITT alleged that of the $40,000 proceeds the appellants had received, whatever amount was being retained by appellants as payment toward fees and expenses not yet earned or incurred was subject to the writs of garnishment that had been served on them on April 9. On May 16, four days after serving this reply to appellants' answer to the writ, ITT moved the district court to cite the Bartons for criminal contempt on the theory that the Bartons were attempting to obstruct justice through a series of fraudulent transfers that were calculated to remove their assets from the reach of the court's process. The motion was heard by the court on June 18, but no ruling was made. On August 26, ITT moved the court to require the Bartons to deposit in the registry of the court the proceeds of the second Barnett Bank cashier's check, the one for $59,076.71. The same theory was asserted as the basis for the motion: the Bartons would transfer these funds to avoid the court's process. This motion was denied on September 9. The district court's order recited that Florida law would not authorize such a turn-over order until ITT prevailed on the merits of its unliquidated claims against the Bartons.
 
 
 9
 On April 21, 1976, the district judge held a hearing for the stated purpose of disposing of all pending motions, including ITT's motion, filed over eleven months earlier, to have the Bartons cited for criminal contempt. At the hearing, ITT amended that motion and demanded that appellants also receive a criminal contempt citation. The only theory advanced by ITT to have appellants held in contempt was that they had knowingly and intentionally interfered with orders of the district court. No specific orders were mentioned, however.
 
 
 10
 At the conclusion of the hearing on the pending motions (including the amendment to ITT's motion for criminal contempt citations), the district court made the following announcement from the bench:
 
 
 11
 I am going to grant the motion for a contempt order in the form of a rule to show cause, and should there be any question or doubt, which is not presently in my mind as to the validity of the writ of (garnishment), the Court will issue a temporary injunction in joining (sic ) any person who has possession of these funds from in any manner transferring them without further order of the Court.
 
 
 12
 Transcript, April 21, 1976, at 37. This order was subsequently reduced to writing on April 27.[6] Later in the day ITT moved the court to require the Bartons and the appellants to turn over the proceeds of the two Barnett Bank cashier's checks and to deposit them in the registry of the court. On May 7, 1976, the court apparently reversing the position taken in its September 9, 1975, order that a turn-over order could not issue until ITT obtained a judgment against the Bartons granted the motion. The appellants (and the Bartons) were ordered to deposit $99,076.71, representing the proceeds of the two Barnett Bank cashier's checks, in the court's registry. This turn-over order completely vitiated the district court's temporary injunction in its April 27 order, which enjoined the transferral of the checks or their proceeds. On May 20, at 9:15 a. m., a show cause hearing (noticed in the court's order of April 27, 1976) was convened before the district court. The appellants were twelve minutes late in arriving. By the time they arrived, the hearing had been adjourned, and they found that they (and the Bartons) had just been held in contempt of court for failing to comply with the turn-over order and that a ten-day jail sentence had been imposed as punishment. The execution of the sentence was stayed for forty-eight hours, however, to give the appellants (and the Bartons) a chance to purge themselves by depositing $99,076.71 in the court's registry. Appellants immediately moved the court to vacate the contempt adjudication and asked for an opportunity to be heard, stating that their late arrival at the hearing was excusable. Their request for a hearing was promptly denied, and the motion to vacate the order of contempt was overruled the next day. The appellants did not tender the money to the registry of the court, as previously ordered. Instead, they took the first of the appeals now before us.[7]
 
 
 13
 On June 21, long after the forty-eight hour stay of the execution of the ten-day jail sentence had expired, arrest warrants were issued out against each of the appellants (and the Bartons). The warrants contained a recital by the district court that they were being arrested for failing to tender to the court the sum of $99,076.71, the total amount of the two Barnett Bank cashier's checks. For reasons not disclosed by the record on appeal, the warrants were never executed. On July 8, however, the matter of jailing the appellants (and the Bartons) was brought to the district court's attention when it heard ITT's motion calling for the immediate execution of the ten-day jail sentence. In the course of the hearing, the court amended its previous contempt order by stating that appellants (and the Bartons) were in civil contempt for failing to comply with the court's previous orders, including those of April 27 and May 20, 1976. The adjudication of contempt having been modified, the court proceeded to order the appellants (and the Bartons) remanded to the custody of the Marshal to begin service of a new sentence of confinement, this one for 175 days, subject, however, to the following proviso:
 
 
 14
 (T)his Court will, upon motion, rescind this order upon compliance by the respondents (appellants and the Bartons) with this Court's previous order of May 20, 1976 allowing the respondents to purge themselves of contempt by turning over to the Clerk of this Court for deposit into its registry, all of the monetary funds represented by and obtained from the proceeds of Cashier's Check No. 23578 in the amount of $59,076.71, and Cashier's Check No. 23579 in the amount of $40,000.00, both of which were issued by the Barnett Bank of Ormond Beach on the 14th day of March, 1974; . . . .
 
 
 15
 Appendix at 353. The court conditioned appellants' (and the Bartons') purge of the contempt order on the turning over of the proceeds of both cashier's checks. As for the appellants, the court imposed this condition even though it had never been demonstrated that they had ever had possession of the $59,076.71 check or the proceeds thereof.[8] Because they did not purge themselves, the appellants were incarcerated at the conclusion of the hearing and remained in jail until July 10, when they secured a bond for their release. On July 21, 1976, from the amended contempt order, the appellants took the second of the appeals now under consideration.[9]
 
 II
 
 16
 It is a well established principle that an order of civil contempt cannot stand if the underlying order on which it is based is invalid. In contrast, the validity of a criminal contempt adjudication resulting from the violation of a court order does not turn on the meritoriousness of that order.
 
 
 17
 (I)n a criminal contempt the validity of the order allegedly disobeyed is not open to question in the slightest degree. Disobedience constitutes a contempt even though the order is set aside on appeal or otherwise becomes ineffective. In contrast, civil contempt falls with the order if it turns out to have been erroneously or wrongfully issued. United States v. United Mine Workers, 1947, 330 U.S. 258, 294, 67 S.Ct. 677, 91 L.Ed. 884; Worden v. Searls, 1887, 121 U.S. 14, 7 S.Ct. 814, 30 L.Ed. 853; Gompers v. Buck's Stove & Range Co., 1911, 221 U.S. 418, 451, 31 S.Ct. 492, 55 L.Ed. 797.
 
 
 18
 Cliett v. Hammonds, 305 F.2d 565, 570 (5th Cir. 1962) (emphasis added). Thus, in the case before us, the district court's order of July 8, 1976, holding the appellants in civil contempt,[10] cannot be sustained unless the turn-over order (entered May 7, 1976),[11] which the appellants admittedly violated, was validly issued. Alabama Rural Fire Insurance Co. v. Naylor, 530 F.2d 1221 (5th Cir. 1976); Heyman v. Kline, 456 F.2d 123, 131 (2d Cir.), cert. denied, 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972).
 
 
 19
 The turn-over order of May 7, 1976, was essentially an extension of the injunctive order of April 27, 1976,[12] wherein the appellants were enjoined from in any way expending or transferring the proceeds of the two Barnett Bank cashier's checks. To justify the issuance of that injunction, the district judge recited that it had been issued "in aid of reserving its jurisdiction and authority, in order to avoid its jurisdiction being divested and in order to prevent irreparable harm to (ITT)." Record, vol. 4, at 770. The court gave no indication why the issuance of the turn-over order, nine days after the injunction became effective, was necessary either in aid of its jurisdiction or to prevent irreparable harm to ITT. In fact, no reasons for the entry of the order were given.
 
 
 20
 The district court had no independent source of subject matter jurisdiction to support the issuance of the turn-over order (or the preceding injunction) apart from the diversity jurisdiction conferred by the pending action between ITT and the Bartons. Consequently, if the district court had authority to fashion this injunctive relief, that authority must have derived from (1) the Florida substantive law bearing on the issues in both the diversity action and the ancillary garnishment proceedings against the appellants; (2) the All Writs Act, 28 U.S.C. § 1651 (1970), which empowers a federal court to issue "all writs necessary or appropriate in aid of" the jurisdiction being exercised by the court; or (3) the inherent power of a trial court efficiently to process to a conclusion the litigation pending before it. We discuss each of these potential sources of authority in turn.
 
 A. The Florida Law
 
 21
 As we have pointed out in part I supra, ITT's initial complaint against the Bartons contained six counts, each of which stemmed from the contractual relationship John Barton had with ITT to oversee the construction of the Palm Coast development.[13] Each count was premised on a common law theory which ITT claimed entitled it to recover the damages it allegedly suffered as a consequence of the kickback scheme purportedly devised and carried out by John Barton. The appellants were made parties to the proceedings when ITT invoked Florida's garnishment statute, which permitted a plaintiff in an action to recover on a debt or a judgment to garnishee a debtor of the defendant.[14] The appellants answered the writ denying that they were indebted to the Bartons. This answer was followed by a reply by ITT. Under the garnishment statute, the answer and reply raised a triable issue of fact.[15]
 
 
 22
 At the time the district court entered the injunction of April 27, 1976, and the turn-over order nine days later, neither the diversity action between ITT and the Bartons nor the issues of fact raised by the appellants' answer to the writ of garnishment and ITT's reply had come on for trial. The purpose of the turn-over device, therefore, was to force the appellants (and the Bartons) to pay into the registry of the court the sum of $99,076.71, even though it had not yet been established that the Bartons were indebted to ITT in at least that amount and that the appellants owed a garnishable debt to the Bartons.[16]
 
 
 23
 ITT has pointed to no statutory provision in Florida's garnishment scheme, and we can find none, that would have explicitly authorized a Florida court, presiding over issues such as these, to order the garnishee to pay funds into the registry of the court to secure the payment of a judgment that might subsequently be entered against the garnishee. In fact, under the statutory scheme, the only method of satisfying a judgment against a garnishee who declined to pay it voluntarily was through a writ of execution.[17] In the light of what we consider to have been an unambiguous legislative intent to defer to this method of satisfying a judgment in garnishment, we are loathe to find an implied statutory authorization for the injunctive remedy the trial court fashioned in this case.
 
 
 24
 B. The All Writs Act and The Inherent Powers Doctrine
 
 
 25
 The authority of a district court to invoke the extraordinary powers conferred by the All Writs Act and the inherent powers doctrine assumes, as we have previously stated, the presence of an independent source of subject matter jurisdiction, in this case diversity of citizenship. But that authority is not unlimited. Rather, it is firmly circumscribed, its scope depending on the nature of the case before the court and the legitimacy of the ends sought to be achieved through the exercise of the power.
 
 
 26
 Both the All Writs Act and the inherent powers doctrine provide a federal court with various common law equity devices to be used incidental to the authority conferred on the court by rule or statute. The All Writs Act may be said to provide a federal court with those writs necessary to the preservation or exercise of its subject matter jurisdiction. The Act is necessary because federal courts, being courts of limited jurisdiction, would not otherwise possess the tools necessary to implement their jurisdictional grants.[18] The inherent powers doctrine, however, does not derive from a statutory base. Instead, the doctrine is rooted in the notion that a federal court, sitting in equity, possesses all of the common law equity tools of a Chancery Court (subject, of course, to congressional limitation) to process litigation to a just and equitable conclusion. See Ex parte Peterson, 253 U.S. 300, 312-14, 40 S.Ct. 543, 64 L.Ed. 919 (1920).
 
 
 27
 As we perceive it, the All Writs Act could have served as authority for the turn-over order here in question only to curb conduct which threatened improperly to impede or defeat the subject matter jurisdiction then being exercised by the court. See Continental Illinois National Bank & Trust Co. v. Chicago Rock Island & Pacific Railway Co., 294 U.S. 648, 675-76, 55 S.Ct. 595, 79 L.Ed. 1110 (1935). Conversely, conduct not shown to be detrimental to the court's jurisdiction or exercise thereof could not have been enjoined under the Act. E. g., Callaway v. Benton, 336 U.S. 132, 149-50, 69 S.Ct. 435, 93 L.Ed. 553 (1949). Thus, in the case at hand, for the turn-over order to have validity, it must be shown that it was directed at conduct which, left unchecked, would have had the practical effect of diminishing the court's power to bring the litigation to a natural conclusion.[19]
 
 
 28
 The business to be disposed of by the court below was the trial of the main suit and the trial of the ancillary garnishment proceeding. When ITT pressed the district court for injunctive relief, it made no showing that the issuance of a turn-over order was necessary to enable the court to try the issues to final judgment. Moreover, ITT has failed to persuade us in this appeal that the trial court's ability to reach judgment would somehow have been impaired unless the proceeds of the two cashier's checks were deposited in the registry of the court. We can think of no reason why the turn-over order was necessary to allow the district court to effectuate its subject matter jurisdiction.
 
 
 29
 The All Writs Act also empowers a federal court to employ procedures necessary to promote the resolution of issues in a case properly before it. This power is limited, however, to the facilitation of the court's effort to manage the case to judgment. Thus, it has been held that a court may rely on the Act to issue orders to aid in conducting factual inquiries, American Lithographic Co. v. Werckmeister, 221 U.S. 603, 609-10, 31 S.Ct. 676, 55 L.Ed. 873 (1911), or to permit the use of interrogatories in habeas corpus proceedings, Harris v. Nelson, 394 U.S. 286, 298-300, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969). In these cases the Act is said to aid the court in the exercise of its jurisdiction. Consequently, if a court is able to effect a full and complete resolution of the issues before it without resorting to the extraordinary measures contemplated under the Act, then such measures cannot be employed. In the case before us, we think that at the time the turn-over order was entered, the district court was well equipped to develop the material issues and to bring them to a complete resolution whether or not the money was in the registry of the court. To be sure, with the money in the registry of the court, ITT would have been in a better position to enforce any judgment that it might have obtained against the appellants, but
 
 
 30
 (t)he fact that a party may be better able to effectuate its rights or duties if a writ is issued never has been, and under the language of the statute cannot be, a sufficient basis for issuance of the writ.
 
 
 31
 United States v. New York Telephone Co., --- U.S. ----, 98 S.Ct. 364, 381, 54 L.Ed.2d 376 (1977) (Stevens, J., dissenting) (citations omitted). In sum, we cannot say that the turn-over order was a legitimate implementation of the All Writs Act.
 
 
 32
 We are also convinced that the order was not a legitimate exercise of the court's inherent powers. The doctrine of inherent powers, as we have indicated, provides a federal court "with appropriate instruments required for the performance of (its) duties" and essential to the administration of justice.[20] Peterson, 253 U.S. at 312, 40 S.Ct. at 547 (emphasis added). At first blush it might appear that inherent powers are broader in scope than those conferred by the All Writs Act because of the absence of a reference to "jurisdiction." The limitation that inherent powers be used only as required for the performance of duties suggests, however, that the exigencies of the pending litigation dictate the breadth of a court's discretion to invoke these powers just as they operate to bridle a court's discretion under the All Writs Act. In Peterson, the issue was whether, absent explicit authority under rule or statute, the district court had the power to refer the performance of certain accounting to an auditor. Because it was apparent that neither the district judge nor the jury could achieve an intelligent resolution of the issues in the case without the referral to the auditor, the referral was held to fall within the court's inherent power.
 
 
 33
 In DeBeers Consolidated Mines, Ltd. v. United States, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945), the Supreme Court spoke to the propriety of a district court's use of prejudgment sequestration (of property) as an application of inherent power, where, as here, the prospect of a final judgment in the plaintiff's favor is somewhat remote.[21] In holding that the extraordinary measure (sequestration) undertaken by the district court was not an appropriate exercise of the court's inherent power, the Supreme Court said,
 
 
 34
 In truth the purpose and effect of the injunction is to provide security for performance of a future order which may be entered by the court. Its issue presupposes or assumes the following things: (1) that the court has obtained jurisdiction of the persons of the defendants; (2) that it may be found and adjudged that the United States has stated a cause of action in its complaint; (3) that a decree may be entered after trial on the merits enjoining and restraining the defendants from certain future conduct; (4) that the defendants may disobey the decree entered; (5) that a proceeding may be instituted for contempt and will result adversely to the defendants; (6) that a fine may be imposed; (7) that the defendants may neglect or refuse to pay the fine; (8) that an execution issued for the collection of the fine pursuant to 18 U.S.C. § 569 may be ineffectual to seize property or money of the defendants in liquidation of the fine, unless the moneys and properties covered by the injunction are held to await the event.
 
 
 35
 325 U.S. at 219, 65 S.Ct. at 1134. Although the suit in DeBeers sought equitable relief, we think that the following passage indicates that its teaching is clearly apposite to actions at law and, in particular, to the instant case:
 
 
 36
 To sustain the challenged order would create a precedent of sweeping effect. This suit, as we have said, is not to be distinguished from any other suit in equity. What applies to it applies to all such. Every suitor who resorts to chancery for any sort of relief by injunction may, on a mere statement of belief that the defendant can easily make away with or transport his money or goods, impose an injunction on him, indefinite in duration, disabling him to use so much of his funds or property as the court deems necessary for security or compliance with its possible decree. And, if so, it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character has been thought justified in the long history of equity jurisprudence.
 
 
 37
 Id. at 222, 65 S.Ct. at 1135 (emphasis added). It is plain to us that the turn-over order cannot be sustained as a proper exercise of the district court's inherent power to perform its duties and to process the pending litigation to a just conclusion.[22]
 
 III
 
 38
 For the reasons we have stated, we find that the underlying turn-over order of May 7, 1976, the violation of which led to the civil contempt adjudications against appellants Warren and Brinkley, now on appeal in Nos. 76-2410 and 76-3138, was invalid ab initio. Accordingly, the orders of May 20 and July 8, 1976, adjudging appellants in contempt, are VACATED. The only issue still pertaining to the Bartons in this case is the validity of the district court's order enjoining the transfer of the proceeds of the cashier's checks, which is raised in appeal No. 76-2410. Since we have found that issue to be moot, the appeal is DISMISSED as to them.[23]
 
 
 
 *
 Senior District Judge of the Southern District of New York, sitting by designation
 
 
 [1]
 These appeals call into question the turn-over order, entered May 7, 1976, see note 11 infra and accompanying text, and the contempt order of July 8, 1976, see note 9 infra and accompanying text. Because Warren and Brinkley are not parties to the main suit below, the diversity action, the contempt order is final as to them, Southern Ry. v. Lanham, 403 F.2d 119, 124 (5th Cir. 1968), and is properly reviewable by us as a final order pursuant to the terms of 28 U.S.C. § 1291 (1970)
 
 
 [2]
 One of the counts of the complaint alleged a breach of an express employment contract. Four of the counts sounded in tort. They alleged the following theories: (1) breach of a fiduciary duty; (2) conversion; (3) fraud; and (4) misappropriation of an employer's funds. The remaining count sought recovery against the Bartons for money had and received. On July 30, 1975, ITT amended its complaint, adding seven counts. See note 13 infra
 
 
 [3]
 John Barton admitted the receipt of this money from the contractors. He contended, however, that he had properly earned these sums while moonlighting as an engineering consultant in his spare time
 
 
 [4]
 For a discussion of Florida's prejudgment garnishment scheme, see notes 14-17 infra and accompanying text
 
 
 [5]
 Although ITT and the Bartons were of diverse citizenship at the time of the removal and, thus, the district court has subject matter jurisdiction, the removal was improvidently taken because the Bartons are residents of the forum state. See 28 U.S.C. § 1441(b) (1970). Over one year after the removal, a motion to remand was filed by the Bartons and opposed by ITT. The motion was denied. Because of this delay, we consider that the Bartons were estopped to seek a remand. See Craig v. Champlin Petroleum Co., 421 F.2d 236, 237-39 (10th Cir. 1970)
 
 
 [6]
 The order granted the injunctive relief and scheduled a show cause hearing on the contempt issue for May 20, 1976, at 9:15 a. m
 
 
 [7]
 Appeal No. 76-2410. This appeal was taken by appellants and the Bartons from the following orders of the district court: (1) order of April 27, 1976, see note 6 supra and accompanying text; (2) order of May 7, 1976, requiring the Bartons and the appellants to deposit $99,076.71 in the court's registry; and (3) two orders of May 20, 1976, one of which adjudged the Bartons and the appellants in contempt and imposed sanctions, as we have recounted in the text preceding this note. The other order denied the Bartons' motion for recusal of the district judge
 Prior to oral argument in these consolidated appeals (Nos. 76-2410 and 76-3138), a panel of this court entertained ITT's motion to dismiss portions of appeal No. 76-2410. The panel granted the motion. Thus, the only issues remaining for our consideration in No. 76-2410 are these: (1) the propriety of the April 27 order enjoining the appellants and the Bartons from transferring the proceeds of the two cashier's checks, and (2) the validity of the order of May 20 adjudging the appellants in contempt and imposing sanctions (that were never carried out). The Bartons were dismissed by the panel as to this part of the appeal.
 It is now clear from a consideration of the entire record in this case that the April 27 injunction directed to the check proceeds expired when the turn-over order of May 7 was issued. Consequently, that portion of appeal No. 76-2410 is moot. Since this was all that was left of the Bartons' appeal, we dismiss appeal No. 76-2410 as to them. As for appellants, the May 20 contempt adjudication is now the sole viable issue in appeal No. 76-2410. The May 20 order is also under consideration in appeal No. 76-3138, which was taken from the July 8 order. That order amended and superseded the order of May 20, see notes 8 & 9 infra and accompanying text, and consequently we dispose of the two appeals as though they were one.
 
 
 [8]
 It could fairly be argued that for this reason alone, the order of contempt was a nullity and, thus, should be overturned. Not only was there no showing that the appellants ever received the $59,076.71 check or its proceeds, but also the record contains uncontradicted evidence, and ITT so concedes in these appeals, that the check was cashed and the monies were retained by the Bartons, personally. For the purpose of our analysis in these appeals, however, we shall treat the underlying turn-over order and the order adjudging the appellants in contempt as though they required the appellants to turn over only $40,000
 
 
 [9]
 Appeal No. 76-3138. See note 7 supra
 
 
 [10]
 The July 8, 1976, order was clearly an adjudication of civil and not criminal contempt. The order was styled "Order of Civil Contempt." While this characterization by the trial court is not dispositive, Southern Ry. v. Lanham, 403 F.2d 119, 124 (5th Cir. 1968), it is beyond dispute that the intended effect of the contempt order was to coerce the appellants to comply with the order and not to punish them for noncompliance. This feature of the order is controlling in this case. Penfield Co. v. SEC, 330 U.S. 585, 590-91, 67 S.Ct. 918, 91 L.Ed. 1117 (1947); Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 441-44, 31 S.Ct. 492, 55 L.Ed. 797 (1911); Skinner v. White, 505 F.2d 685 (5th Cir. 1974)
 
 
 [11]
 Although the appeal from the turn-over order of May 7 (No. 76-2410) was dismissed on ITT's preargument motion, see note 7 supra, that dismissal does not preclude us from determining whether the turn-over order could serve as a valid basis for the contempt adjudication questioned in appeal No. 76-3138
 
 
 [12]
 See note 6 supra and accompanying text
 
 
 [13]
 On July 30, 1975, the complaint was amended to add seven counts. See note 2 supra. In two of the counts, ITT asserted new theories for the recovery of the same liquidated damages alleged in ITT's initial complaint. In one count, ITT sought the imposition of a constructive trust on any kickback monies John Barton may have received. In the other count, ITT alleged that Barton had breached statutory standards regulating the conduct of Florida engineers and land surveyors. A third count asserted ITT's right to unliquidated damages for a breach of the same statutory standards. The remaining four counts realleged the claims of fraud, conversion, misappropriation, and breach of fiduciary duty set out in ITT's initial complaint, except that these counts asserted that the damages to ITT were unliquidated. ITT added these claims for unliquidated damages because it felt that the alleged kickback scheme involved indeterminably greater amounts of money than it had originally claimed as liquidated damages
 
 
 [14]
 At the outset, we recognize that the Florida Supreme Court has declared the state's prejudgment garnishment provisions unconstitutional. Ray Lein Construction, Inc. v. Wainwright, 346 So.2d 1029 (Fla.1977). See also Bunton v. First Nat'l Bank, 394 F.Supp. 793 (M.D.Fla.1975). Ray Lein was rendered two years after the writs of garnishment were issued in this case. It is not clear whether the Florida Supreme Court would apply Ray Lein retroactively, even to a case like this, which has not reached final adjudication. Cf. Grimes v. Florida, 244 So.2d 130, 132-33 (Fla.1971) (refusing to apply retroactively exclusionary rule in search and seizure case). Therefore, we pretermit the question whether the Florida Supreme Court would apply Ray Lein to prohibit the application of the garnishment provisions to this case, because we hold that the district court exceeded its authority under the statutes, even if their application is not prohibited
 The Florida prejudgment garnishment scheme was established in Fla.Stat.Ann. § 77.01 (West Supp.1977), which states in pertinent part,
 (e)very person who has sued to recover a debt or has recovered judgment in any court against any person . . . has a right to a writ of garnishment . . . to subject any debt due to defendant by a third person.
 (Emphasis added.) But, in order to entitle a plaintiff, such as ITT in this case, to employ the prejudgment garnishment procedure, the plaintiff had first to state that the debt on which the defendant was being sued was just, due and unpaid. § 77.031. Florida law expressly forbade the use of prejudgment garnishment in tort actions. § 77.02. See notes 2 and 13 supra, which set out the tort claims in ITT's complaint (which presumably served as a foundation for the issuance of the writs against appellants).
 Subsequent to the service of the writs of garnishment on the appellants, the Bartons moved to dissolve the writs on the ground, inter alia, that ITT was not entitled to utilize Florida's prejudgment garnishment scheme in a suit where, as here, recovery was not being sought on a debt or a judgment. The motion was perfunctorily denied.
 
 
 [15]
 Although the Florida prejudgment garnishment statutes did not expressly provide for a trial of the issues joined by the answer and reply, that a trial was contemplated is an inescapable conclusion when one reads the various statutory provisions as a whole. Fla.Stat.Ann. § 77.04 (West Supp.1977), provided that
 (t)he writ shall require the garnishee to serve an answer to it on plaintiff within twenty (20) days after service stating whether he is indebted to defendant at the time of the answer, or was indebted at the time of service of the writ, or at any time between such times; and in what sum . . . of defendant he has in his possession or control at the time of his answer, or had at the time of the service of the writ, or at any time between such times.
 Section 77.081(1) provided that "(i)f the garnishee fails to answer as required, a default shall be entered against him." If the garnishee did answer, however, and the plaintiff replied to that answer, § 77.082 referred to a trial: "if the garnishee prevails in the trial of any reply." Further, § 77.083 provided that where a material issue is raised by the garnishee's answer and the plaintiffs' reply, "(j)udgment against garnishee on his answer or after trial of a reply to his answer shall be entered for the amount of his liability as disclosed by the answer or trial." Finally, if the garnishee prevailed at trial, § 77.17 provided that "(t)he garnishee shall be allowed the pay of a witness for his attendance out of the debt owed to defendant or the property in his possession. If there is no debt or property in his possession, the allowance shall be against plaintiff."
 
 
 [16]
 Fla.Stat.Ann. § 77.081(2) (West Supp.1977) provided that "(n)o final judgment against a garnishee shall be entered before the entry of, or in excess of, the final judgment against the original defendant."
 
 
 [17]
 Fla.Stat.Ann. § 77.13 (West Supp.1977) provided that in the event a prejudgment garnishee, against whom a judgment had been entered, did not satisfy it, "the court may order execution issued for the unpaid amount of plaintiff's judgment against defendant." Section 77.13 went on to provide that writs of execution so issued would be handled as other executions under Florida law. We think this provision foreclosed any alternative method of compelling a garnishee to respond financially to a writ or a resulting judgment in garnishment
 
 
 [18]
 It has been postulated that Congress relied on the necessary and proper clause of the Constitution in passing the Act. See generally Frankfurter & Landis, Power of Congress over Procedure in Criminal Contempts in "Inferior" Federal Courts A Study in Separation of Powers, 37 Harv.L.Rev. 1010, 1016-1023 (1924)
 
 
 [19]
 Status quo orders illustrate this concept well. A federal court has the power under the All Writs Act to issue injunctive orders in a case even before the court's jurisdiction has been established. When potential jurisdiction exists, a federal court may issue status quo orders to ensure that once its jurisdiction is shown to exist, the court will be in a position to exercise it. See, e. g., FTC v. Dean Foods Co., 384 U.S. 597, 603-05, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966)
 
 
 [20]
 Although inherent powers are often referred to as "incidental" powers, they are not sources for mere orders of convenience. Action taken by a federal court in reliance on its inherent powers must somehow be indispensable to reaching a disposition of the case. See Van Alstyne, The Role of Congress in Determining Incidental Powers of the President and of the Federal Courts: A Comment on the Horizontal Effect of the "Sweeping Clause", 36 Ohio St.L.J. 788 (1975)
 
 
 [21]
 ITT's chances of recovering a judgment against the appellants in the garnishment proceedings are contingent, at best. Initially, it should be observed that of the six counts of ITT's initial complaint against the Bartons (the writs of garnishment against the appellants were issued on the basis of the initial complaint, not the amended complaint, see notes 13 & 14 supra ), only one conceivably qualifies as an action to recover on a debt or judgment so as to support the issuance of the prejudgment writ of garnishment against the appellants. That is the common law count seeking recovery for money had and received. Thus, in order to utilize the prejudgment garnishment procedure to satisfy a judgment against the Bartons, ITT would first have had to obtain a declaration that the common law count is a suit on a debt and then to obtain a favorable judgment on that count. (A judgment in favor of ITT on the remaining counts of the initial complaint could not have supported a judgment against appellants on the prejudgment writ because of the prohibitions of Fla.Stat.Ann. §§ 77.01, .02 (West Supp.1977), see note 14 supra. As for the amended complaint, it could not have served to support the writs against appellants because the writs were issued before the amended complaint was filed.)
 Even if ITT were to prevail on the money-had-and-received count of the initial complaint, some substantial hurdles will still have to be overcome before it would be entitled to judgment on the writ against the appellants. Not only would ITT have to prevail on the constitutional attack on the prejudgment writ, see note 14 supra, which has not been presented to the trial court, but also on several multifaceted legal and factual issues, created by the appellants' answer, that remain unresolved. Under Florida law a contingent debt may not be garnished, Cobb v. Walker, 144 Fla. 600, 198 So. 324 (1940), and the appellants contend that any indebtedness they may owe the Bartons is contingent. The appellants also contend that they may assert against ITT any defense available to them as to the Bartons, see Flynn-Harris-Bullard Co. v. Hampton, 70 Fla. 231, 70 So. 385 (1915), as well as any claims arising out of contracts they had with the Bartons when the garnishment proceedings commenced, see Eger Block & Redi-Mix Co. v. Wheeler, 207 So.2d 698 (Fla.App.1968).
 
 
 [22]
 There are other deficiencies in the turn-over order that should be mentioned, as they serve as alternative grounds for reversal. The district court made no findings of fact or conclusions of law in handing down the turn-over order. We believe that Fed.R.Civ.P. 52 and 65, requiring the inclusion of such findings in injunctive orders, apply to the injunctive relief granted by the district judge in this case. Meaningful appellate review is rendered far more difficult, if not impossible, without such findings. McCord, Condron & McDonald, Inc. v. Carpenters Local Union No. 1822, 464 F.2d 1036 (5th Cir. 1972). We cannot tell from the record whether the trial court even considered the requirement that ITT show a likelihood of prevailing on the merits of both the main suit and the ancillary garnishment proceedings with respect to appellants. Such a showing is a condition precedent to injunctive relief. Nor did the court appear to have considered whether ITT should have posted a bond to protect the appellants against an improvidently issued turn-over order
 
 
 [23]
 See note 7 supra